UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**FILED**

SEP 17 2004

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

CHAD JOHNSON, KENNETH TATE,      )
JOHN BRINKMAN, JOHN EDWARDS,      )
HAROLD JACKSON, RONNIE TRAWICK,   )
JOHN COLEMAN, LOYDE HENLEY,       )
JOSEPH KITCHEN, GLENN WHITE,      )
EVERETT HARRIS, SANDRA HOLBROOK,  )
and STACY SMITH,                  )

        Plaintiffs,       **4**    **04CV01266ERW**

v.                                )    Civil Action No.
                                  )
BOARD OF POLICE COMMISSIONERS:    )
JO ANN FREEMAN,                   )    JURY TRIAL DEMANDED
SUSAN C. J. ROLLINS,              )
BARTHOLOMEW SARACINO,             )
MICHAEL J. QUINN,                 )
FRANCIS G. SLAY,                  )
in their official capacities as members of the  )
Board of Police Commissioners-St. Louis City;  )
MARY J. WARNECKE, individually and in her  )
official capacity as Commander of the Fourth  )
District of the St. Louis Metropolitan Police  )
Department; and                   )
THE CITY OF ST. LOUIS,            )
a municipal corporation;          )
                                  )
        Defendants.       )

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION, AND DAMAGES

### I. PRELIMINARY STATEMENT

1.    This civil action seeks injunctive and declaratory relief and damages against the

St. Louis Board of Police Commissioners, Captain Mary Warnecke, and the City of St. Louis to

bring to a halt and to compensate Plaintiffs for acts committed under color of law which deprived

Plaintiffs of rights secured by the Constitution and laws of the United States. Plaintiffs allege that officers of the St. Louis Metropolitan Police Department have acted to "clean up" downtown St. Louis by intimidating and driving Plaintiffs and other homeless or homeless-appearing people from the downtown area. Despite being urged to cease such actions, the St. Louis Metropolitan Police have continued to stop, take homeless and homeless-appearing people into custody, and jail them without reasonable suspicion or probable cause; conduct sweeps to remove homeless and homeless-appearing individuals from the downtown area, especially in connection with significant public events in the area; direct homeless and homeless-appearing people under threat of arrest to remove themselves from Lucas Park, Washington Avenue, Locust Street, Laclede's Landing and other downtown public areas; seize and destroy their personal property, including their food, medicine, magazines, clothes, identification, and food stamp and Medicaid cards; and transport homeless or homeless-appearing individuals away from certain areas of the City and abandon them, all in violation of Plaintiffs' constitutional rights. Plaintiffs and other homeless and homeless-appearing people taken into custody are subjected by the St. Louis Metropolitan Police Department and the City of St. Louis to forced labor without any adjudication of guilt in violation of their constitutional rights.

Plaintiffs allege that the St. Louis Metropolitan Police Department and the City of St. Louis are liable for the equitable relief and damages sought by Plaintiffs because officers of the St. Louis Metropolitan Police Department acted under the command and control of the St. Louis Metropolitan Police Department, the Chief of Police, and the Fourth District Commander and because the Justice Center employees acted under the command and control of the City of St. Louis, all pursuant to the policy or the custom and practice of the St. Louis Metropolitan Police

Department and the City of St. Louis to remove homeless and homeless-appearing people from downtown St. Louis and to discourage them from remaining in the downtown area, and that conduct caused and continues to cause the deprivation of Plaintiffs' rights secured under the Constitution, the laws of the United States, and the laws of the State of Missouri.

2.      In recent years, the City of St. Louis and local business interests have launched an effort to revitalize the commercial and residential character of downtown St. Louis. At the same time, homelessness has been on the rise in the City and elsewhere in Missouri. In response to this situation, philanthropic and religious non-profit organizations have created a number of programs to serve the homeless, including emergency shelters, housing placement assistance, counseling, food services, and employment training. In order to afford homeless people ready access to these services, many providers have located their programs in downtown St. Louis, within walking distance of each other and close to public transportation. Despite the efforts of these service providers, the number of homeless residents in the City greatly exceeds the number of emergency and transitional housing spaces. Even those individuals lucky enough to obtain a shelter bed for the night cannot remain in the shelter during the day. There are only a few day programs in St. Louis for people who are homeless, and, typically, those programs have eligibility requirements that exclude many homeless people. As a result, people who are homeless in the City of St. Louis often have no place other than public parks and other public venues in which to eat, sit, rest, or perform similar activities of daily living. More than half of all homeless people in the state are employed, and many of them must walk in public spaces to find jobs and to get to the jobs they already have.

3.      To promote the continued commercial and residential revitalization of downtown

3

St. Louis, Defendants St. Louis Metropolitan Police Department and the City of St. Louis have a policy or a persistent, common, and well-settled practice and custom of intimidating and driving homeless people and homeless-appearing people from downtown St. Louis. Pursuant to that policy, practice, and custom, Defendants are unconstitutionally criminalizing the daily life activities of homeless City residents who, because of their homeless status, must often eat, sit, and rest in parks and other public places.

4.     On or about October 30, 2003, Plaintiffs' counsel sent a letter to the mayor of the City of St. Louis, the city counselor, and Chief of Police Mokwa informing them of the unlawful policy and treatment of the homeless by police in downtown St. Louis. A copy of the October 30, 2003 letter is attached hereto as Plaintiffs' Exhibit 1 ("P. Ex.") and is incorporated herein by reference. Plaintiffs' counsel requested a meeting with the mayor and police chief to pursue resolution of these activities, but they refused. Plaintiffs' counsel did meet and discuss the problems of homeless individuals in downtown with the city counselor in detail on November 14, 2003 and followed up with a letter that same day outlining remedies for those problems. A copy of the November 14, 2003 letter is attached hereto as P. Ex. 2 and is incorporated herein by reference.

5.     On December 5, 2003, Plaintiffs' counsel met with Captain Mary Warnecke and Major Harry B. Hegger of the St. Louis Metropolitan Police Department, the Department's counsel, and the City Counselor, again described the unlawful police treatment of the homeless in downtown St. Louis, and requested adoption and enforcement of a mutually agreeable written policy to stop this treatment. Efforts to secure such a policy were unsuccessful, and as set forth in the allegations below, the unlawful police treatment of the homeless in downtown St. Louis

4

has continued despite the information and notification about that treatment provided to city and police officials.

## II. JURISDICTION

6.    The court has jurisdiction of this action under 28 U.S.C. § 1331 and § 1343(a)(3). Declaratory and injunctive relief is authorized by 28 U.S.C.§§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

7.    Plaintiffs' claims arise under the Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution as those rights may be redressed pursuant to 42 U.S.C. § 1983 and under 42 U.S.C. § 1988.

## III. PARTIES

Plaintiffs

8.    Plaintiffs John Coleman, Harold Jackson, Everett Harris, Loyde Henley, Joseph Kitchen, Ronnie Trawick, and John Edwards are homeless African-American adult residents of the City of St. Louis, Missouri.  None of them has a permanent address.

9.    Plaintiff Sandra Holbrook is a homeless white adult resident of the City of St. Louis, Missouri.  She does not have a permanent address.

10.    Plaintiff Kenneth Tate is an African-American adult male who resides in a transitional housing facility in the City of St. Louis, Missouri.

11.    Plaintiffs Chad Johnson and Stacy Smith are African-American adult males who were homeless until recently and who continue to use homeless services in downtown St. Louis on a regular basis.

12.    Plaintiff John Brinkman is a white and Native American homeless adult male who

5

is presently staying at Rosati Center, a transitional living facility for the homeless in the City of St. Louis, Missouri.

   13.  Plaintiff Glenn White is an African-American resident of the City of St. Louis, Missouri. He is not homeless, but St. Louis Metropolitan Police, without asking him where he lived, identified him as homeless on a summons that they issued.

   Defendants

   14.  Defendants Freeman, Rollins, Saracino, Quinn, and Slay are commissioners of the Board of Police for the City of St. Louis, Missouri, and, as such, they are responsible for preserving public peace in the city of St. Louis, protecting the rights of its persons and property, and enforcing the ordinances passed by the City Board of Aldermen through a proper and permanent police force. Defendants Freeman, Rollins, Saracino, Quinn, and Slay constitute the official policymaker for the St. Louis Metropolitan Police Department in all matters alleged herein, with the power and duty to control, supervise, and discipline the conduct of St. Louis Metropolitan Police officers, including Defendant Warnecke and officers Drago, Brown, Russo, Coats, Taylor, Nerviani, Bonenberger, and Nicholson. At all times relevant, Defendants Freeman, Rollins, Saracino, Quinn, and Slay, its agents and servants, including Defendant Warnecke and St. Louis Metropolitan Police Department officers Drago, Brown, Russo, Coats, Taylor, Nerviani, Bonenberger, and Nicholson, acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Missouri, the City of St. Louis, and the Board of Police for the City of St. Louis and pursuant to their authority as police commissioners, as the Commander of the Fourth District, and as police officers, respectively. Defendants Freeman, Rollins, Saracino, Quinn, and Slay are sued in their official capacities as

6

commissioners of the Board of Police and are referred to collectively as the "St. Louis Metropolitan Police" or "St. Louis Metropolitan Police Department."

15.     Defendant Mary J. Warnecke at all times relevant was a captain in the St. Louis Metropolitan Police Department and the Commander of the Fourth District of the St. Louis Metropolitan Police Department which encompasses most of downtown St. Louis, was acting under color of law and in such capacity as the agent, servant, and employee of the St. Louis Metropolitan Police Department, was acting under the direction and control of the St. Louis Metropolitan Police Department and/or the Chief of Police, and was acting pursuant to either official policy or the custom and practice of the St. Louis Metropolitan Police Department. In her capacity as Fourth District commander, Defendant Warnecke is responsible for the Fourth District's day-to-day operation, including general supervision of its officers, and on information and belief was exercising supervisory or command authority over the other officers present at the events described in this Complaint. She is sued in her individual and official capacities.

16.     Defendant City of St. Louis is a municipal corporation and constitutional charter city pursuant to the constitution and laws of the State of Missouri.

## IV. STATEMENT OF FACTS

17.     As people who are or were recently homeless, Plaintiffs Johnson, Jackson, Smith, Coleman, Harris, Henley, Kitchen, Trawick, Holbrook, and Edwards receive services, including food and a place to sleep at night when available, from churches, homeless shelters, and other service providers located in downtown St. Louis.  Plaintiffs Tate and Brinkman live in transitional housing, but also use homeless services located in the downtown area.  Plaintiff Smith receives homeless services daily.  Plaintiff White is treated by the Police Defendants as a

7

homeless person.

18.    Plaintiffs Johnson, Jackson, Smith, Coleman, Brinkman, Harris, Henley, Kitchen, Tate, Trawick, Smith, Holbrook, and Edwards must walk to receive these services because they do not have cars or money for bus transportation.

19.    Plaintiffs Johnson, Brinkman, Kitchen, Tate, White, Holbrook, and Edwards work or have worked in downtown St. Louis or have recently sought employment in downtown and must walk in order to get to their jobs or submit employment applications.

20.    Plaintiffs Jackson, Coleman, Brinkman, Harris, Henley, Kitchen, Trawick, Holbrook, and Edwards do not choose or want to be homeless. They have tried to rent, purchase, or otherwise obtain housing without success and have no immediate prospects for altering their homeless status. The City of St. Louis does not have adequate shelter beds or affordable housing to accommodate them or other homeless persons and families in the city.

21.    Because they are homeless and do not have private residences in which to eat, rest, sleep, sit, spend time, and engage in other activities of daily life, Plaintiffs Jackson, Coleman, Brinkman, Harris, Henley, Kitchen, Trawick, Holbrook, and Edwards must often eat, rest, sleep, sit, spend time, and engage in other daily life activities in parks, alleys, and other public areas of downtown St. Louis. Defendants Tate, Edwards, Kitchen, and Holbrook have licenses from the City of St. Louis to engage in work in public places in the city.

22.    Officers Drago, Brown, Russo, Coats, Taylor, Nerviani, Bonenberger, and Nicholson at all times relevant were Police Officers of the St. Louis Metropolitan Police Department, were acting under color of law and in such capacity as the agent, servant and employee of the St. Louis Metropolitan Police Department, were acting pursuant to either

8

official policy or the custom and practice of the St. Louis Metropolitan Police Department, and was acting under the direction and control of the St. Louis Metropolitan Police Department, the Chief of Police, and/or the Fourth District Commander.

Plaintiff Chad Johnson

23.     On July 3, 2004 in the early evening, Plaintiff Chad Johnson was walking from a social service agency to the homeless shelter where he was staying. He stopped to talk with a friend behind the Public Library's Central West building. He observed three vehicles stop behind the main building of the Public Library where some people were gathered, and then he heard firecrackers. He heard the sound of firecrackers coming from behind the main library building. He saw an officer go over and throw a firecracker directly at the poelple sitting on the ledge at the back of the main library building. One of the people gathered behind the library began to run, and he heard someone shout "Police!" "Stop." Plaintiff Johnson observed the person who threw the firecracker and some of the others who had pulled up in the vehicles appear to identify themselves as police officers and start placing handcuffs on the individuals who had been gathered behind the library.

24.     One of the cars that had been behind the main library building then drove over to where Mr. Johnson and his friend were, and the driver suggested that they should leave the area. Before they could do so, the passenger in the car threw a firecracker over the car at Plaintiff Johnson and his friend, and it landed near Johnson and between the feet of his friend. Mr. Johnson was frightened that the fireworks would harm him and his friend by catching their clothes on fire and causing them to suffer burns. Plaintiff Johnson understands that his friend is a homeless Vietnam Veteran who lost his arm in the war. Johnson went over to report to the

9

other officers that a firecracker had been thrown at him and his friend, whereupon he was arrested and handcuffed.

25.     Plaintiff Johnson was placed in a van with two other people and taken to the police station on Jefferson. While he was at the police station, Mr. Johnson saw the man who threw the firecracker at him and pointed him out to the person who was processing him. The booking officer then gave the paperwork to that man, indicating that he should complete the paperwork because he had thrown the firecracker at Johnson. The name of the officer signing the police report/summons is Officer Daniel Drago. The report says that Johnson was drinking in public. Johnson refused to sign the report because he was not drinking. Johnson offered to take a breathalyzer test, but none was administered. Plaintiff Johnson and other individuals were taken to the Justice Center later the night of July 3, 2004. Johnson was held there overnight and had to sleep on the floor without a mat or blanket.

26.     The next morning, Sunday, July 4, 2004, Mr. Johnson was awakened and told to get ready to leave. In the lobby of the Justice Center, officers told him and others that a city judge had said they could be released if they did eight hours of community service work, or otherwise they would be held until Tuesday, July 6, 2004. Johnson felt coerced into doing the community service, in part because he had to go to work at 8 a.m. on Tuesday, July 6 and did not want to lose his job. Johnson and approximately fourteen other individuals were turned over to three people in yellow shirts with the letters "CID" on them. One of those CID people took Johnson and the others in a van labeled Downtown Community Court to Lucas Park. They were told to sign a list so the court would give them credit for the community service. They were issued green vests and ordered to pick up trash. Johnson worked picking up trash in Lucas Park

10

and in the park area from Tucker to Union Station for approximately six hours on July 4, 2004.

27.    Plaintiff Chad Johnson did not go before a judge before he performed the community service work, and he was not paid for that work.

Plaintiff Kenneth Tate

28.    On June 27, 2004, Plaintiff Kenneth Tate, a veteran of the United States Marine Corps who served in Vietnam, was playing his trombone on Market Street in front of the post office in downtown St. Louis when police were summoned to remove him.  Mr. Tate has a permit (No. S-37306) to play music outdoors in public places in the City.  He plays his music as his employment.

29.    Two St. Louis Metropolitan Police officers approached him.  A police cruiser arrived with other police officers.  Although Mr. Tate displayed his permit for playing music, he was placed in handcuffs by one of the officers.

30.    The officer took Mr. Tate's wallet and identification, including his Medicaid and Medicare cards and driver's license, and threw them into the sewer.  One of the officers told Plaintiff Tate he would "kick (his) ass."

31.    Police officers placed Mr. Tate in a police cruiser, and he was driven to First Street and Mullanphy Street.  Other officers followed in their police cars.  Mr. Tate was frightened that the police were going to beat him.  At First and Mullanphy, Tate was told by one of the officers that they were going to cut him some slack.  He was told to get out of the police cruiser.  His belongings were thrown into the street, and one officer said, "Have at it."  The police then drove away, leaving him to walk back downtown carrying his trombone, cooler bag, horn stand and other possessions.  Plaintiff Tate was never charged with any crime.

11

Plaintiff John Brinkman

32.    On July 3, 2004, Plaintiff John Brinkman was in front of the Seven-Eleven store on North 17th Street getting ready with two friends to take a bus to another friend's house for a July 4th holiday celebration.  Brinkman observed three men got out of a white unmarked van in front of the store.  Because they looked as if they had bad intentions, Brinkman walked away.  Two of the men followed Brinkman.  He was grabbed from behind, spun around, punched in the chest by one of the men, thrown to the ground face first, hand-cuffed, and then thrown in the back of the van.  As he was being thrown in the van, Plaintiff Brinkman asked one of the men if they were police, and he responded in the affirmative.  Until that point, none of the men had identified himself as a police officer.  On information and belief, Officer Lance Coats was one of the St. Louis Metropolitan Police officers who arrested Brinkman.

33.    Brinkman was taken to the Justice Center.  He was asked to sign a summons charging him with drinking in public at 601 Market Street, but he refused because he had not been drinking in public, much less at Market Street.  He was held overnight.  On the morning of July 4, 2004, Plaintiff Brinkman was escorted into a large room at the Justice Center with a number of other prisoners.  A uniformed officer told Brinkman and the others that they could be released if they did community service.  When Brinkman was allowed to leave the Justice Center, there were no officers or anyone else to tell him where to go for community service, so he left.

34.    Plaintiff Brinkman had bruises on his chest and side from being punched and thrown to the ground, suffered soreness in his chest for several days afterward, and had welts on his wrists from the plastic ties.  He was so afraid and traumatized by the beating that he hid in the

12

tunnels underneath downtown St. Louis for two days after he was released from jail and would not talk to anyone about what had happened. He was suspended from his job at McMurphy's Grill because he missed work while he was in jail and in hiding.

Plaintiff John Edwards

35.    Plaintiff John Edwards is veteran of the United States Army.

36.    On the mornings of October 4 and October 5, 2003, Plaintiff John Edwards was in Lucas Park, a public park located in downtown St. Louis close to various providers of homeless services. On both occasions, a white female St. Louis Metropolitan Police officer told Edwards that he could not be in the Park until after 5:00 p.m. on those days. On information and belief, there was a house tour in downtown St. Louis on those dates.

37.    On or about October 17, 2003, Mr. Edwards was selling *What's Up* magazine on the corner of Washington Avenue and 13th Street in downtown St. Louis. *What's Up* is a magazine written by and about homeless people and topics relevant to them. Edwards and other homeless people buy multiple copies of the magazine from the publisher for twenty-five cents a piece and then resell them to the public. The vendor gets to keep whatever the buyer pays for the magazine, usually a suggested donation of one dollar each. *What's Up* has a solicitation permit from the City, and Mr. Edwards and other homeless vendors have licenses from the City to sell the magazine. Despite the fact that Edwards had a license from the City of St. Louis to sell the magazine, on information and belief Officer Eddie Brown, a St. Louis Metropolitan Police officer, told him that he had to get off the corner, that he could not sell magazines there, and that he had to go west of Jefferson Avenue.

38.    On July 3, 2004, at approximately 4:30 p.m., Plaintiff John Edwards was arrested

13

in downtown St. Louis at the corner of Tucker and Lucas where he was walking with a friend. He and the friend were arrested by two St. Louis Metropolitan police officers. Mr. Edwards was confined at the Justice Center and not released until July 4, 2004. He was not charged with any crime at the time of his arrest or before his release.

Plaintiff Harold Jackson

39. In the early evening of July 3, 2004. Plaintiff Harold Jackson, a veteran of the United States Army, and Plaintiff Stacy Smith were on the sidewalk near the downtown library. They had left Fair St. Louis because it had started to rain, and they were eating bag lunches they had prepared to take with them to the Fair. Jackson heard a loud noise like a shot gun and turned around to see unmarked vehicles approaching and fireworks being thrown from one or more of them, apparently at people outside the library and in Lucas Park.

40. The vehicles stopped and the men who got out told Jackson and others in the area to line up. One man pulled out his badge and said they were police. Police officers hand-cuffed Jackson and the others. They were taken to a large room at the Jefferson police station that was lined with tables where police officers were interviewing people who had been arrested. Jackson exercised his right to remain silent when the police tried to question him. Later that night, Jackson was transported to the Justice Center with other people who had been arrested at the library.

41. St. Louis Metropolitan Police told Jackson that he was being charged with begging, but he is not sure if he was given a summons. He was released from the Justice Center on the morning of July 4, 2004 and went to St. Patrick's Center where he remained until mid-afternoon.

14

42.     At that time, Jackson and a friend left the Center, bought some hot wings, and went to Lucas Park to eat them. Again, Jackson heard firecrackers, and some of the same vehicles carrying some of the same St. Louis Metropolitan Police officers from the day before pulled up. Along with his friend and others in the park, Jackson was hand-cuffed, placed in police cruisers that had arrived near the park, and again transported to the Jefferson Avenue station. The Sergeant said to two of the plain-clothes officers who had arrested Jackson, "That's Mr. Jackson, he's not going to talk to us. Find somewhere to put him." When Jackson was told to empty his pockets, he became concerned that one of the officers was trying to plant drugs on him.

43.     After Jackson had voiced his concern and was being escorted to a cell, one of the officers began to push him forcefully, leading to an altercation in which Jackson was sprayed with mace, hit in the ribs, and had his shirt ripped off. The St. Louis Metropolitan Police officers had Jackson remove his shoes and belt and then told him to take off the rest of his clothes. He was placed in a cell, naked. Later that night, he was transported naked in a police cruiser to the Justice Center, made to walk naked from the cruiser to the Justice Center, and placed naked in a windowed observation cell where he remained until a guard on a new shift brought him a t-shirt and jail pants and shoes. He was subsequently placed in a cell with other men, including Plaintiff Smith and others who were arrested with them.

44.     Plaintiff Jackson was released at about 5:30 p.m. on July 5, 2004. The summons signed by Officer David Nerviani charges Jackson with drinking in public at 501 Pine, but Jackson does not drink alcohol, has been sober for 12 years, and was not arrested at the indicated location.

15

45.    St. Louis Metropolitan Police did not return Jackson's watch, clothing, or the contents of his pockets which included his birth certificate, Social Security and Veterans Administrations cards, and his girlfriend's silver chain. The police did return his Missouri State ID card, but it was broken into two pieces.

Plaintiffs Ronnie Trawick and John Coleman

46.    On July 3, 2004, Plaintiff Ronnie Trawick and Plaintiff John Coleman were sitting at a picnic table at Kiener Plaza in downtown St. Louis. Two unmarked police vehicles pulled up to the park on the Market Street side. Six officers, five male and one female, got out and asked them for identification. The officers said they would do a warrant check.

47.    One of the officers stated there were no warrants against Trawick or Coleman. One officer asked if they were going to Fair St. Louis. Trawick and Colemen indicated in the affirmative, and the officers left.

48.    Approximately 5 to 10 minutes later, two of the officers, on information and belief St. Louis Metropolitan Police Officers Michael Nicholson and David Bonenberger, returned, told Trawick and Coleman to put their hands behind their backs, and handcuffed them. When they asked why they were being arrested, one of the officers stated, "We'll think of something."

49.    Plaintiffs Trawick and Coleman were put in a minivan and taken to the corner of 14th and Market Street where they were transferred to a police cruiser in which several other people had already placed. All of the people in the back of the cruiser were African-American men.

50.    Plaintiffs Trawick and Coleman were charged with drinking in public, taken to

the Jefferson police station and then to the Justice Center, and placed in a holding cell. Neither Trawick nor Coleman was drinking in public. They were kept at the Justice Center until the next day, Sunday, July 4, 2004. On the morning of July 4, an officer told a group, including Trawick and Coleman, that they were being released early because a judge said they could be released if they did 8 hours of community service that same day. Three men came dressed in yellow shirts which had the letters "CID" on the back of the shirts. Several names were called and those people went with the CID people. Plaintiffs Trawick and Coleman did not have their names called, and they were released.

51.      On July 5, 2004, Plaintiff Coleman saw three police wagons pull up to Lucas Park and observed approximately six police officers arrest everyone in the park, approximately twelve people. He has witnessed similar sweeps of the park at other times.

Plaintiff Loyde Henley

52.      On July 4, 2004, Plaintiff Loyde Henley was in Lucas Park in downtown St. Louis in the late afternoon. He had some food he had received from a shelter, and also had with him his personal belongings, including prescription medication for a heart condition.

53.      At about 5:45 p.m. on July 4, approximately six plainclothes police officers came into the park. They had guns and radios. The police officers ordered everyone in the park, approximately 10 people, to stand in a certain spot. The police put Mr. Henley and the others in the park into police cruisers and took them to the police station, then to the jail. Henley was forced to leave his bags and medicine in the park.

54.      Police checked for any outstanding warrants against Mr. Henley, but found none. On information and belief, St. Louis Metropolitan Police officer David Nerviani gave Mr.

17

Henley a summons for drinking in public. Henley does not drink alcohol and was not drinking in public. He asked to take a breathalyzer test, but police refused that request. The summons given to Mr. Henley is directed to an individual named Amos Robinson and refers to an alleged violation at 501 Pine Street. Mr. Henley does not know who Amos Robinson is and was not arrested at 501 Pine Street.

55.     Plaintiff Henley was held until the next day, July 5, 2004, and released at approximately 6:00 p.m.

56.     Plaintiff Henley told St. Louis Metropolitan Police officers at the jail that he was on medication for his heart and needed his bags with his medicine. Police told him to "shut up."

57.     A St. Louis Metropolitan Police officer told Mr. Henley that police needed people to clean up the Arch grounds after the fireworks, and that police wanted him to help with the clean-up. The officer said he had to do it without getting paid. He refused.

58.     When Plaintiff Henley was released from jail on July 5, he went back to the park and found that his bags were gone along with his medication, food stamp card, clothes and other belongings.

59.     Because Mr. Henley was confined until the evening of July 5, he was too late to get into the homeless shelter where he had been staying. He could not go back to that shelter again for several weeks because he had lost his place there.

Plaintiff Joseph Kitchen

60.     On July 4, 2004, Plaintiff Kitchen was sitting on a bench, with his bag of belongings, in Kiener Plaza downtown eating chicken wings and drinking a soda when an unmarked van pulled up near him. Three men, who later identified themselves as St. Louis

18

Metropolitan Police officers and one of whom, on information and belief was Officer David Nerviani, got out of the vehicle and approached him. One of the officers pointed to a can of beer on a bench on the other side of the park and asked if it belonged to Kitchen. When Kitchen said no, the officer said "It does now," and pulled out a police badge. The officers hand-cuffed Kitchen and then knocked over his soda and spilled his chicken wings to the ground. The officers were laughing while this action took place.

61.     Plaintiff Kitchen, with his bag of belongings, was transported to a police station on Jefferson Avenue in the van. On the way, one officer pointed out people who were drinking in public, but the officers said they were not going to stop to pick them up.

62.     At the police station, one officer asked another what to charge everyone with. Another officer started pointing at people and randomly assigning charges. Plaintiff Kitchen was charged with drinking in public. He was subsequently transported to the Justice Center. He was held approximately 23 hours and was released on July 5, 2004.

63.     Plaintiff Joseph Kitchen is employed selling *What's Up* magazine. He has a license from the City to sell the magazine. When his bag was returned after his release, a candy bar, cookies, and about twenty copies of the magazine were missing.

64.     Plaintiff Kitchen has been told by St. Louis Metropolitan Police that he cannot be in downtown St. Louis. He has been told by St. Louis Metropolitan Police that he cannot sell *What's Up* magazine on the sidewalks at 6th and Olive in downtown St. Louis despite the fact that he has license to do so.

    Plaintiff Glenn White

65.     On July 2, 2004, Plaintiff White was at the Wendy's restaurant across from

19

Kiener Plaza downtown. He observed a commotion in the park and saw plain-clothes police officers arrest about 10 African-American people in the park. The police at first handcuffed the ten people and then removed the handcuffs while the ten people cleaned the park.

66.     On July 4, 2004, Officer Russo, a St. Louis Metropolitan Police officer, and another unknown officer, both dressed in uniform, approached Plaintiff White in an unmarked car. They told him he could not stand outside the Marriott hotel in downtown St. Louis during Fair St. Louis, but that he could come back when it was over. Plaintiff White then walked to the corner of Fourth Street and Washington Avenue. The same two officers came up to him again, ran his name through a computer, and found he had no warrants. They then left.

67.     In the middle of June, 2004, Plaintiff White was walking down 15th Street in downtown St. Louis, past the court building on Olive, carrying a paper bag. A St. Louis Metropolitan Police officer drove by in a police truck pulling a horse trailer and, seeing White, made a u-turn to come back and talk to him. He demanded to know what was in the paper bag, found an open can of beer, and arrested White for drinking in public. Plaintiff White was taken to the Justice Center and held for approximately ten hours.

Plaintiff Everett Harris

68.     Plaintiff Everett Harris, a United States Army veteran who served three years in Vietnam, was arrested over the 4th of July weekend. On July 3, 2004, in the late afternoon or early evening, he was standing near the downtown main library building with a group of ten or so people. Several men in street clothes drove up in a van and two other vehicles. One of the men threw firecrackers at Plaintiff Harris and the others.

69.     The men then got out of the vehicles and began putting hand-cuffs on Harris and

20

others.  On information and belief, Officer Lance Coats, a St. Louis Metropolitan Police officer, arrested Harris.  Plaintiff Harris was taken to the police station on Jefferson, was held there until nearly midnight, and then was transported to the Justice Center.

70.     Plaintiff Harris was not released until about noon the next day, July 4, 2004.  He was charged with drinking in public, but he was not drinking alcohol.

71.     While at the Justice Center, Plaintiff Harris observed some CID people single out about 10 people to do community service, but they did not choose Harris.

72.     Plaintiff Harris has observed St. Louis Metropolitan Police make homeless people leave Lucas Park and arrest homeless people downtown before major events.

Plaintiff Sandra Holbrook

73.     On July 3, 2004, Plaintiff Sandra Holbrook was sitting on a wall outside the public library in downtown St. Louis waiting with other homeless people for a mobile outreach van that serves food.  Plainclothes police officers pulled up in an unmarked sport utility vehicle and asked if anyone had any warrants.  They also asked for identification which Holbrook provided.  Plaintiff Holbrook had no warrants. One of the officers said, "The rich people downtown don't want homeless people around."  Holbrook was arrested for begging, even though she was wearing her badge and permit identifying her as a vendor for *What's Up* Magazine.

74.     At the same time that the police were arresting Holbrook and the others, she saw other police throw firecrackers at other people in the area.

75.     Plaintiff Holbrook was taken to the police station on Jefferson and then later transferred to the Justice Center where she was confined until about noon on July 4, 2004.  On

21

the morning of July 4, a jail official told some other people in custody with Holbrook that a judge said some of them would have to perform eight hours of community service before they would be released. Plaintiff Holbrook was not required to do community service and was released.

76.     When Holbrook was arrested, St. Louis Metropolitan Police confiscated her *What's Up* identification badge, vendor's license and duffle bag containing several of the magazines. Police did not return these items to her when she was released on July 4, 2004. She had to retrieve them from the police department on Jefferson Avenue on July 5. As a result of her unlawful detention, Holbrook was unable to sell her magazines to Fair St. Louis patrons on July 3 and July 4, 2004.

77.    On August 5, 2004, Plaintiff Holbrook was in the park adjacent to the downtown public library with several other homeless people. Two male officers on horseback approached them and said it was a "disgrace" for them to take up residency in the park. The officers told them to leave because it would not look good to people coming downtown for Strassenfest to see homeless people in the park.

Plaintiff Stacy Smith

78.     On the afternoon of July 4, 2004, Plaintiff Stacy Smith was eating hot wings in Lucas Park with Plaintiff Harold Jackson. They were waiting for Smith's girlfriend to meet them so that they all could go to Fair St. Louis.

79.     After about twenty minutes, Plaintiff Smith heard firecrackers and saw two vehicles pull up and park at the corner of the Park. Two St. Louis Metropolitan Police in plain clothes approached Smith and Jackson. One officer ordered them to come with the officers and

22

instructed Smith to finish eating because he was going to jail. The Police Officers began hand-cuffing Smith, Jackson, and 10 to 15 other people they rounded up from the Park. When Plaintiff Smith asked the officer about his bag which he had left by the bench, one of the officer said "F___ your bag. It will be here when you get back." Smith and the others were loaded into police cruisers that had arrived, and they were taken to the police station on Jefferson. Smith later observed Plaintiff Jackson being escorted from the police station naked, in hand-cuffs and leg shackles. When Smith was subsequently transported to the Justice Center, he also saw Jackson in an observation cell, still naked. Later that night, Jackson was placed in the cell with Smith and other men, at which time Jackson was wearing jail clothes.

80.     Plaintiff Smith was released from the Justice Center at about 5:00 p.m. on July 5, 2004. He had been told that he would be charged with drinking in public, but he was not given a summons before he was released. He was not drinking alcohol. He is in recovery and has been sober for five months. A friend found Plaintiff Smith's bag in Lucas Park and kept it for him.

81.     Officer David Nerviani signed a summons charging Plaintiff Smith with drinking in public at 1000 Chestnut, a number of blocks from Lucas Park where Smith was arrested.

82.     The treatment of the Plaintiffs as described above was taken pursuant to an official policy or a practice, custom, and usage that are well established, pervasive, and continuing.

83.     On or about October 13, 2003, David Lewis, who was homeless at the time, was sitting in Lucas Park, eating a peanut butter sandwich and drinking apple juice. A St. Louis Metropolitan Police officer accused him of drinking beer in public, asked him for identification, threatened to spray him with Mace, and handcuffed him while a records check was run. The

23

officer released Lewis after learning that he had no record. The St. Louis Metropolitan Police officer took Lewis' peanut butter sandwich.

84.     In the fall of 2003, a St. Louis Metropolitan Police officer approached Martin DuBose, who was homeless at the time, while he was sitting in Lucas Park. The officer told DuBose that he looked suspicious because he was white and that the officer would be keeping an eye on him. On another occasion in September of 2003, Martin DuBose was sitting in Lucas Park when a St. Louis Metropolitan Police officer accused him of vagrancy, ordered him to leave the Park, and threatened to put him in jail if the officer saw him in Lucas Park again.

85.     On July 3 and July 4, 2004, Mr. DuBose heard and saw firecrackers thrown by St. Louis Metropolitan Police at homeless people near the public library and Lucas Park.

86.     On or about September 30, 2003, Mae Fuller, who was homeless at the time, went to Christ Church Cathedral at 8:00 a.m. to get breakfast. While Fuller and others were waiting to enter the church for breakfast, St. Louis Metropolitan Police, using a racial slur, told them to get out of the alley and warned them not to be found there again. The following morning, a St. Louis Metropolitan Police van was parked outside Christ Church Cathedral.

87.     Approximately two weeks later, Mae Fuller was sitting in Lucas Park waiting for the New Life Evangelistic Center shelter to open when a St. Louis Metropolitan Police officer rolled up on a scooter, told her that she could not wait in the Park, and threatened her with arrest if she did so. She and other homeless individuals left the Park, and the staff at New Life let them into the shelter ten minutes early.

88.     On at least three occasions, Cecil Purvey, who was homeless at the time, was told by St. Louis Metropolitan Police that he could not be in Lucas Park. The St. Louis Metropolitan

24