UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHAD JOHNSON, KENNETH TATE,                    )
JOHN BRINKMAN, JOHN EDWARDS,                   )
HAROLD JACKSON, RONNIE TRAWICK,                )
JOHN COLEMAN, LOYDE HENLEY,                    )
JOSEPH KITCHEN, GLENN WHITE,                   )
EVERETT HARRIS, SANDRA HOLBROOK,               )
STACY SMITH, TERRY ARTIS,                      )
MELVIN BURNETT, STEVE DICKENS,                 )
TANYA FINCH, FREDERICK HIGGINS,                )
VAN HUNNICUTT,  PATRICIA JORDAN,               )
KEITH LOYD, LUSTER REYNOLDS,                   )
MILTON ROSS, TIMOTHY SWIFT,                    )
WILLIAM TOLLIVER, and ISABELL WOODEN, )
                                               )
                Plaintiffs,                    )
v.                                             )        No. 4:04CV-01266 ERW
                                               )
BOARD OF POLICE COMMISSIONERS:                 )
JO ANN FREEMAN,                                )        JURY TRIAL DEMANDED
CHRISTOPHER GOODSON,                           )
BARTHOLOMEW SARACINO,                          )
MICHAEL J. QUINN,                              )
FRANCIS G. SLAY,                               )
in their official capacities as members of the )
Board of Police Commissioners-St. Louis City; )
MARY J. WARNECKE, individually and in her     )
official capacity as Commander of the Fourth  )
District of the St. Louis Metropolitan Police )
Department;                                    )
DAVID BONENBERGER, EDDIE BROWN,                )
LANCE COATS, BRIAN DAVENPORT,                  )
DANIEL DRAGO, ROBERT ERNST,                    )
KELLY FISHER, DAVID NERVIANI,                  )
LILA PAYNE, JOHN RUSSO,                        )
STEVEN STROHMEYER, TODD GRIMES,                )
THOMAS DUBACH, LATROY TAYLOR,                  )
MARQUIS WREN, and                              )
JOHN/JANE DOES 1 - 25,                         )
law enforcement officers whose identities are )

unknown to Plaintiffs,                                    )
in their individual capacities;                           )
THE CITY OF ST. LOUIS,                                    )
a municipal corporation;                                  )
DOWNTOWN ST. LOUIS COMMUNITY        )
IMPROVEMENT DISTRICT, INC.,                    )
a Missouri corporation, and                            )
DOWNTOWN ST. LOUIS PARTNERSHIP, INC., )
a Missouri corporation,                                    )
                                                                     )
              Defendants.                        )

## FIRST AMENDED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION, AND DAMAGES

## I.  PRELIMINARY STATEMENT

1.    This civil action seeks injunctive and declaratory relief and damages against the St. Louis Board of Police Commissioners, Captain Mary Warnecke, individual St. Louis Metropolitan Police Department officers, the City of St. Louis, Downtown St. Louis Partnership, and Downtown St. Louis Community Improvement District ("CID") to bring to a halt and to compensate Plaintiffs for acts committed under color of law which deprived Plaintiffs of rights secured by the Constitution and laws of the United States.  Plaintiffs allege that officers of the St. Louis Metropolitan Police Department have acted to "clean up" downtown St. Louis by intimidating and driving Plaintiffs and other homeless or homeless-appearing people from the downtown area. Despite being urged to cease such actions, the St. Louis Metropolitan Police have continued to stop, take homeless and homeless-appearing people into custody, and jail them without reasonable suspicion or probable cause; conduct sweeps to remove homeless and homeless-appearing individuals from the downtown area, especially in connection with significant public events in the area; direct homeless and homeless-

appearing people under threat of arrest to remove themselves from Lucas Park, Washington Avenue, Locust Street, Kiener Plaza, Laclede's Landing and other downtown public areas; seize and destroy their personal property, including their food, medicine, magazines, clothes, identification, and food stamp and Medicaid cards; and transport homeless or homeless-appearing individuals away from certain areas of the City and abandon them, all in violation of Plaintiffs' constitutional rights. Plaintiffs and other homeless and homeless-appearing people taken into custody are subjected by the St. Louis Metropolitan Police Department, the City of St. Louis, and Downtown CID/Partnership to forced labor without any adjudication of guilt in violation of their constitutional rights.

Plaintiffs allege that the St. Louis Metropolitan Police Department, Warnecke, the City of St. Louis, and Downtown CID/Partnership are liable for the equitable relief and damages sought by Plaintiffs because officers of the St. Louis Metropolitan Police Department acted under the command and control of the St. Louis Metropolitan Police Department, the Chief of Police, and the Fourth District Commander and because the Justice Center employees acted under the command and control of the City of St. Louis, all pursuant to the policy or the custom and practice of the St. Louis Metropolitan Police Department and the City of St. Louis and the mutual agreement, conspiracy, and/or joint action among the St. Louis Metropolitan Police Department, Warnecke, the City of St. Louis, and Downtown CID/Partnership to remove homeless and homeless-appearing people from downtown St. Louis and to discourage them from remaining in the downtown area, and that conduct caused and continues to cause the deprivation of Plaintiffs' rights secured under the Constitution, the laws of the United States, and the

laws of the State of Missouri.

2.      In recent years, the City of St. Louis and local business interests have launched an effort to revitalize the commercial and residential character of downtown St. Louis.  At the same time, homelessness has been on the rise in the City and elsewhere in Missouri.   In response to this situation, philanthropic and religious non-profit organizations have created a number of programs to serve the homeless, including emergency shelters, housing placement assistance, counseling, food services, and employment training.  In order to afford homeless people ready access to these services, many providers have located their programs in downtown St. Louis, within walking distance of each other and close to public transportation.  Despite the efforts of these service providers, the number of homeless residents in the City greatly exceeds the number of emergency and transitional housing spaces.  Even those individuals lucky enough to obtain a shelter bed for the night cannot remain in the shelter during the day. There are only a few day programs in St. Louis for people who are homeless, and, typically, those programs have eligibility requirements that exclude many homeless people.  As a result, people who are homeless in the City of St. Louis often have no place other than public parks and other public venues in which to eat, sit, rest, or perform similar activities of daily living.

3.      Perceiving the presence and visibility of homeless individuals to be a deterrent to the commercial and residential revitalization of downtown St. Louis, Defendants Downtown CID/Partnership, St. Louis Metropolitan Police Department, Warnecke, the City of St. Louis reached a mutual understanding to use and established a policy or a persistent, common, and well-settled practice and custom of using the

municipal ordinance enforcement process to intimidate and drive homeless people and homeless-appearing people from downtown St. Louis.  Pursuant to that policy, practice, custom, conspiracy, and/or joint action, Defendants are unconstitutionally criminalizing the daily life activities of homeless City residents who, because of their homeless status, must often eat, sit, and rest in parks and other public places.

4.       On or about October 30, 2003, Plaintiffs' counsel sent a letter to the mayor of the City of St. Louis, the city counselor, and Chief of Police Mokwa informing them of the unlawful policy and treatment of the homeless by police in downtown St. Louis.  A copy of the October 30, 2003 letter is attached hereto as Plaintiffs' Exhibit 1 ("P. Ex.") and is incorporated herein by reference.  Plaintiffs' counsel requested a meeting with the mayor and police chief to pursue resolution of these activities, but they refused. Plaintiffs' counsel did meet and discuss the problems of homeless individuals in downtown with the city counselor in detail on November 14, 2003 and followed up with a letter that same day outlining remedies for those problems.  A copy of the November 14, 2003 letter is attached hereto as P. Ex. 2 and is incorporated herein by reference.

5.       On December 5, 2003, Plaintiffs' counsel met with Captain Mary Warnecke and Major Harry B. Hegger of the St. Louis Metropolitan Police Department, the Department's counsel, and the City Counselor, again described the unlawful police treatment of the homeless in downtown St. Louis, and requested adoption and enforcement of a mutually agreeable written policy to stop this treatment.  Efforts to secure such a policy were unsuccessful, and as set forth in the allegations below, the unlawful police treatment of the homeless in downtown St. Louis has continued despite the information and notification about that treatment provided to city and police officials.

6.     On March 11, 2004, Plaintiffs' counsel met with Downtown CID/Partnership's board chairman, its security director, and several City officials.  At the meeting, Plaintiffs reiterated their concerns about the unlawful police and city court enforcement of municipal ordinances against the homeless in downtown St. Louis.  Despite the information and notification about that treatment provided by plaintiffs to city, police, and Downtown CID/Partnership officials, the unlawful treatment of the homeless in downtown St. Louis has continued as set forth in the allegations below.

## II. JURISDICTION

7.     The court has jurisdiction of this action under 28 U.S.C. § 1331 and § 1343(a)(3).  Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

8.     Plaintiffs' claims arise under the Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution as those rights may be redressed pursuant to 42 U.S.C. § 1983 and under 42 U.S.C. § 1988.

## III. PARTIES

Plaintiffs

9.     Plaintiff Chad Johnson is an African-American adult male resident of the City of St. Louis, Missouri who was at all times relevant homeless.  He presently resides in an apartment in the City of St. Louis, Missouri.

10.     Plaintiff Kenneth Tate is an African-American adult male resident of the City of St. Louis, Missouri.  At all times relevant, he lived in a transitional housing facility in the City of St. Louis, Missouri.  He has no permanent residence and is presently incarcerated in the City of St. Louis, Missouri.

11.     Plaintiff John Brinkman is a white and Native American adult male who at all times relevant was homeless and presently resides at a hotel in the City of St. Louis, Missouri.

12.     Plaintiff John Edwards is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

13.     Plaintiff Harold Jackson is an African-American adult male who was at all times relevant homeless in the City of St. Louis, Missouri.  He presently lives at a homeless shelter in Junction City, Kansas.  He has no permanent address.

14.     Plaintiff Ronnie Trawick is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He is presently living at a homeless shelter in the City of St. Louis.  He has no permanent address.

15.     Plaintiff John Coleman is an African-American adult male who was at all times relevant homeless in the City of St. Louis, Missouri.  He has no permanent residence.

16.     Plaintiff Loyde Henley is an African-American adult male who was at all times relevant homeless in the City of St. Louis, Missouri.  He presently resides with family members in St. Louis County, Missouri.

17.     Plaintiff Joseph Kitchen is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

18.     Plaintiff Glenn White is an African-American resident of the City of St. Louis, Missouri.  He was not homeless at the time of the incidents described below, but St. Louis Metropolitan Police, without asking him where he lived, identified him as homeless on a summons that they issued.

19.     Plaintiff Everett Harris is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

20.     Plaintiff Sandra Holbrook is a white adult female resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  She has no permanent address.

21.     Plaintiff Stacy Smith is an African-American adult male who had recently been homeless and at all times relevant was using homeless services in downtown St. Louis.  He presently resides in St. Peters, Missouri.

22.     Plaintiff Terry Artis is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

23.     Plaintiff Melvin Burnett is an African-American adult male resident of the City of St. Louis, Missouri who was at all times relevant homeless.  He presently resides in an apartment in the City of St. Louis, Missouri.

24.     Plaintiff Steve Dickens is an African-American adult male who was at all times relevant homeless in the City of St. Louis, Missouri.  He has no permanent residence and is presently incarcerated in the City of St. Louis, Missouri.

25.     Plaintiff Tanya Finch is an African-American adult female resident of the City of St. Louis.  She was not homeless at the time of the incident described below, but on information and belief, she appeared homeless to St. Louis Metropolitan Police.

26.     Plaintiff Frederick Higgins is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

27.     Plaintiff Van Hunnicutt is an Afrcian-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

28.     Plaintiff Patricia Jordan is a white adult female resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  She has no permanent address.

29.     Plaintiff Keith Loyd is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

30.     Plaintiff Luster Reynolds is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

31.     Plaintiff Milton Ross is an African-American adult male resident of the City of St. Louis, Missouri who is and was at all times relevant homeless.  He has no permanent address.

32.     Plaintiff Timothy Swift is an African-American adult male resident of the City of St. Louis, Missouri who was at all times relevant homeless.  He presently resides with family members in the City of St. Louis, Missouri.

33.     Plaintiff William Tolliver is an African-American adult male resident of the City of St. Louis who was at all times relevant homeless.  He presently resides in an apartment in the City of St. Louis, Missouri.

34.     Plaintiff Isabell Wooden is an African-American adult female resident of the City of St. Louis who was at all times relevant homeless.  She presently resides in a subsidized apartment in the City of St. Louis, Missouri

Defendants

35.     Defendants Freeman, Goodson, Saracino, Quinn, and Slay are commissioners of the Board of Police for the City of St. Louis, Missouri, and, as such, they are responsible for preserving public peace in the city of St. Louis, protecting the rights of its persons and property, and enforcing the ordinances passed by the City Board of Aldermen through a proper and permanent police force.  Defendants Freeman, Goodson, Saracino, Quinn, and Slay constitute the official policymaker for the St. Louis Metropolitan Police Department in all matters alleged herein, with the power and duty to control, supervise, and discipline the conduct of St. Louis Metropolitan Police officers, including Defendants Warnecke, Bonenberger, Brown, Coats, Davenport, Drago, Ernst, Fisher, Nerviani, Payne, Russo, Strohmeyer, Grimes, DuBach, Taylor, and Wren.  At all times relevant, Defendants Freeman, Goodson, Saracino, Quinn, and Slay, its agents and servants, including Defendants Warnecke, Bonenberger, Brown, Coats, Davenport, Drago, Ernst, Fisher, Nerviani, Payne, Russo, Strohmeyer, Grimes, DuBach, Taylor,

Wren, and John/Jane Does 1 - 25 acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Missouri, the City of St. Louis, and the Board of Police for the City of St. Louis and pursuant to their authority as police commissioners, as the Commander of the Fourth District, and as police officers, respectively.  Defendants Freeman, Goodson, Saracino, Quinn, and Slay are sued in their official capacities as commissioners of the Board of Police and are referred to collectively as the "St. Louis Metropolitan Police," "St. Louis Metropolitan Police Department," or the "St. Louis Police Board."

36.     Defendant Mary J. Warnecke at all times relevant was a captain in the St. Louis Metropolitan Police Department and the Commander of the 4th District of the St. Louis Metropolitan Police Department which encompasses most of downtown St. Louis, was acting under color of law and in such capacity as the agent, servant, and employee of the St. Louis Metropolitan Police Department, was acting under the direction and control of the St. Louis Metropolitan Police Department and/or the Chief of Police, and was acting pursuant to official policy or the custom and practice of the St. Louis Metropolitan Police Department and her mutual agreement and conspiracy with the St. Louis Metropolitan Police, the City of St. Louis, and Downtown CID/Partnership.  In her capacity as 4th District commander, Defendant Warnecke is responsible for the 4th District's day-to-day operation, including general supervision of its officers, and on information and belief was exercising supervisory or command authority over the other officers present at the events described in this Complaint. She is sued in her individual and official capacities.

11

37.     Defendants David Bonenberger, Eddie Brown, Lance Coats, Brian Davenport, Daniel Drago, Robert Ernst, Kelly Fisher, David Nerviani, Lila Payne, John Russo, Steven Strohmeyer, Todd Grimes, Thomas DuBach, Latroy Taylor, and Marquis Wren at all times relevant were officers in the St. Louis Metropolitan Police Department, were acting under color of law and in such capacity as the agents, servants, and employees of the St. Louis Metropolitan Police Department, were acting under the direction and control of the St. Louis Metropolitan Police Department, the Chief of Police, and/or the 4th District Commander, and were acting pursuant to official policy or the custom and practice of the St. Louis Metropolitan Police Department and the mutual agreement, conspiracy, and/or joint action among the St. Louis Metropolitan Police, Warnecke, the City of St. Louis, and Downtown CID/Partnership.

38.     Defendants John/Jane Does 1 - 25, whose names are presently unknown to Plaintiffs, at all times relevant were officers in the St. Louis Metropolitan Police Department and were acting under color of law and in such capacity as the agents, servants, and employees of the St. Louis Metropolitan Police Department, were acting under the direction and control of the St. Louis Metropolitan Police Department, the Chief of Police, and/or the 4th District Commander, and were acting pursuant to official policy or the custom and practice of the St. Louis Metropolitan Police Department and the mutual agreement, conspiracy, and/or joint action among the St. Louis Metropolitan Police, Warnecke, the City of St. Louis, and Downtown CID/Partnership.

39.     Defendant City of St. Louis is a municipal corporation and constitutional charter city pursuant to the constitution and laws of the State of Missouri.

40.     Defendant Downtown St. Louis Community Improvement District, Inc. is a Missouri non-profit corporation with its principal place of business at 906 Olive, St. Louis, Missouri.

41.     The corporation presently named Downtown St. Louis Community Improvement District, Inc. was created in 1997.  Until 2002, its legal name was The Downtown St. Louis Partnership, Inc.  In that year, Downtown St. Louis Management, Inc., Downtown St. Louis Development, Inc., and Downtown St. Louis Presents, Inc. merged into The Downtown St. Louis Partnership, Inc., which corporation then changed its name to Downtown St. Louis Community Improvement District, Inc.

42.     Defendant Downtown St. Louis Partnership, Inc. is a Missouri non-profit corporation with its principal place of business at 906 Olive, St. Louis, Missouri.

43.     The corporation presently named Downtown St. Louis Partnership, Inc. was created in 1958 and had, as its previous legal names, Downtown St. Louis, Inc. and Downtown in St. Louis, Inc.  Defendants Downtown St. Louis Community Improvement District, Inc. and Downtown St. Louis Partnership, Inc. are hereinafter referred to collectively as "Downtown CID/Partnership."

44.     At all times relevant, Defendants Downtown CID/Partnership participated jointly and/or in willing concert and conspiracy with Defendants St. Louis Metropolitan Police, Warnecke, and City of St. Louis in the matters alleged below and acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Missouri, the City of St. Louis, and the St. Louis Police Board.

## IV.  STATEMENT OF FACTS

45.    As people who are or were homeless, Plaintiffs Johnson, Brinkman, Jackson, Smith, Coleman, Harris, Henley, Kitchen, Trawick, Holbrook, Edwards, White, Artis, Burnett, Dickens, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden receive or have received services, including food and a place to sleep at night when available, from churches, homeless shelters, and other service providers located in downtown St. Louis.  Plaintiff Tate has also used homeless services located in the downtown area.  Plaintiffs White and Finch were treated by the Police Defendants as homeless persons.

46.    Plaintiffs Johnson, Brinkman, Jackson, Smith, Coleman, Harris, Henley, Kitchen, Trawick, Holbrook, Edwards, White, Artis, Burnett, Dickens, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden often must or had to walk to receive these services because they do not have cars or do not always have money or passes for bus or car transportation.

47.    Plaintiffs Johnson, Brinkman, Jackson, Kitchen, Tate, White, Harris, Holbrook, Edwards, Burnett, Loyd, and Wooden work or have worked in downtown St. Louis or have recently sought employment in downtown and often must walk in order to get to their jobs or submit employment applications.

48.    Plaintiffs Johnson, Brinkman, Jackson, Smith, Coleman, Harris, Henley, Kitchen, Trawick, Holbrook, Edwards, White, Artis, Burnett, Dickens, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden did not choose or want to be homeless.  They often tried to rent, purchase, or otherwise obtain housing

14

without success.  The City of St. Louis does not have adequate shelter beds or affordable housing to accommodate them or other homeless persons and families in the city.

49.     Because they are or have been homeless and without private residences in which to eat, rest, sleep, sit, spend time, and engage in other activities of daily life, Plaintiffs Johnson, Brinkman, Jackson, Smith, Coleman, Harris, Henley, Kitchen, Trawick, Holbrook, Edwards, White, Artis, Burnett, Dickens, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden have often had to eat, rest, sleep, sit, spend time, and engage in other daily life activities in parks, alleys, and other public areas of downtown St. Louis.  Plaintiffs Tate, Edwards, Kitchen, Burnett, and Holbrook have or at all times relevant had licenses from the City of St. Louis to engage in work in public places in the city.

50.     The efforts to revitalize the commercial and residential character of downtown St. Louis have in large part been spearheaded by Defendants Downtown CID/Partnership.

51.     To serve as a funding mechanism for those revitalization efforts, Defendant Downtown St. Louis Community Improvement District was established for a 5-year term in 2000 pursuant to Mo. Rev. Stat. §§ 67.1401 et seq. which authorizes property owners within a district to form a non-profit corporation for imposing assessments on real property in the district and spending those proceeds solely for the benefit of the district's property owners.

52.     Defendant City of St. Louis originally approved the establishment of the Downtown St. Louis Community Improvement District ("CID") in 1999.  The CID was

renewed by a petition of property owners within the district and approved by Defendant City for an additional 7-year term that began on January 1, 2005.

53.     Defendant Downtown St. Louis Partnership has at all times relevant managed the CID.

54.     Defendants Downtown CID/Partnership identified removing homeless people from downtown St. Louis as an objective that they would work to achieve in order to promote residential and commercial revitalization of the downtown area.

55.     Defendants Downtown CID/Partnership, St. Louis Metropolitan Police, Warnecke, and the City of St. Louis reached and agreed to a mutual understanding that they would use the municipal ordinance enforcement process to remove homeless people from downtown St. Louis by arresting them without probable cause for alleged "quality of life" or public nuisance ordinance violations, incarcerating them for 20 hours without a warrant or efforts to obtain one, directing them to remove themselves from public spaces in downtown, and subjecting them to forced labor without an adjudication of guilt, the intended and foreseeable result of which was to violate Plaintiffs' constitutional rights.

56.     Defendant Warnecke and Defendant City of St. Louis officials are *ex officio* members of the board of directors of Defendants CID and Downtown Partnership.

57.     The CID petitions approved by Defendant City of St. Louis and the major programs and services of Defendants Downtown CID/Partnership have at all times relevant included a security program to address "quality of life" or public nuisance violations in downtown St. Louis as well as marketing and special events programs to shape the public image of downtown St. Louis and coordinate all downtown events.

58.     During the first term, the boundaries of the CID were generally Chouteau Avenue to the south, Interstate 70 to the east, Cole Street to the north, and 18th Street to the west.  In the second term, the boundaries of the CID are generally Interstate 40/64 to the south, Interstate 70 to the east, Cole Street to the north, and 18th Street to the west.

59.     The boundaries of the CID are within the catchment area of the 4th Police District.

60.     Defendants Downtown CID/Partnership, City of St. Louis, and St. Louis Metropolitan Police agreed to establish and willfully participated in operating a Downtown Community Court ("DCC") that was dedicated solely to providing "swift and predictable justice" for specified "quality of life" or public nuisance ordinance violations committed within the CID.

61.     Defendants Downtown CID/Partnership and Defendant City of St. Louis executed the Downtown Community Court Cooperative Agreement ("DCC Agreement"), under the terms of which Defendants Downtown CID/Partnership paid the City $235,000.00 per year for court operation expenses, increased costs of incarceration, and court salaries, including that of the municipal judge, in connection with the DCC. Defendant City of St. Louis authorized the DCC Agreement on or about July 1, 2002.

62.     In addition to establishing the DCC and specifying the quality of life violations within the CID that the DCC would hear, the DCC Agreement provided that non-dangerous offenders sentenced to community service would be assigned to the supervision of an employee of Defendants Downtown CID/Partnership and those offenders would be outfitted so as to identify them as offenders performing community service.

63.     On or about the fall of 2002, the Downtown Community Court began operation, and all cases involving specified "quality of life" violations alleged to have occurred within the CID were assigned to be heard there.

64.     A Downtown Community Court Advisory Committee was established pursuant to the DCC Agreement and at all times relevant has included representatives of Defendants Downtown CID/Partnership, City of St. Louis, and St. Louis Metropolitan Police as well as a homeless services provider located in the downtown area.  In addition, there is a Downtown Homeless Taskforce that at all times relevant has met regularly and includes Defendant Warnecke and representatives of Defendants Downtown CID/Partnership, City of St. Louis, and St. Louis Metropolitan Police.

65.     On or about December 1, 2001, Defendants Downtown CID/Partnership and Defendant St. Louis Metropolitan Police executed a Police Assistance Agreement ("Police Agreement"), under the terms of which Defendant St. Louis Metropolitan Police agreed to deploy supplemental police officers, collectively known as the Downtown Police Unit, to patrol and address public nuisance violations in the CID and to make the 4th District Commander and the lieutenant of the Downtown Police Unit available for regular meetings with Downtown CID/Partnership officials.

66.     In the Police Agreement, Defendants Downtown CID/Partnership agreed to pay Defendant St. Louis Metropolitan Police up to $100,000.00 per year for overtime for Police officers and supervisors for extra patrols, special events, and special details in the CID as requested by Defendants Downtown CID/Partnership and mutually agreed upon with Defendant St. Louis Metropolitan Police.

18

67.     In addition to obtaining a Downtown Police Unit of St. Louis Metropolitan Police officers and extra St. Louis Metropolitan Police officers for special events in the CID, Defendants Downtown CID/Partnership have established and funded a private security force known as CID Guides who patrol the CID and work directly with St. Louis Metropolitan Police to target public nuisance violations in downtown St. Louis. Defendants Downtown CID/Partnership have also paid Defendant St. Louis Metropolitan Police to train the CID guides.

68.     On information and belief, the CID Guides participate in the supervision of individuals performing community service within the CID pursuant to court order.

69.     After obtaining prior approval from Defendants CID/Partnership and City of St. Louis, Defendant St. Louis Metropolitan Police issued Special Orders to its officers providing that individuals arrested for alleged quality of life violations within the CID must be booked when the Court is not in session and must be held for 20 hours.

70.     On information and belief, Defendants Downtown CID/Partnership and Defendant St. Louis Metropolitan Police, including Defendant Warnecke and her staff in the 4th Police District, coordinate the preparations for all major events in downtown St. Louis, including those for Fair St. Louis 2004.

71.     Defendant St. Louis Metropolitan Police placed Defendant Warnecke in command of Police operations in downtown St. Louis for Fair St. Louis, and Defendant Warnecke directed Police officers under her command to target quality of life violations in the downtown area, to make a custodial arrest and book all individuals alleged to have committed such violations, and to hold those individuals for 20 hours.

72.     Defendants Bonenberger, Coats, Davenport, Drago, Fisher, Nerviani, Payne, Taylor, Wren, and some or all of John/Jane Does 1 - 25 were members of the Anti-Crime Taskforce of Defendant St. Louis Metropolitan Police and were assigned to patrol downtown St. Louis during Fair St. Louis under the command of Defendant Warnecke.  Defendant Ernst was also assigned to patrol downtown St. Louis during Fair St. Louis under the command of Defendant Warnecke.  On information and belief, Defendants Brown, Russo, Strohmeyer, Grimes, and some of John/Jane Does 1 - 25 were at all times relevant assigned to the 4th Police District under the command of Defendant Warnecke.

73.     Defendant City of St. Louis ordered that all individuals arrested for alleged quality of life ordinance violations in downtown St. Louis during Fair St. Louis July 2 through July 4, 2004 could be released from custody prior to July 6, 2004 if they performed 8 hours of community service without a plea or adjudication of guilt.

74.     Defendants City of St. Louis and Downtown CID/Partnership agreed that Defendants Downtown CID/Partnership would take custody of and supervise those individuals arrested for alleged quality of life ordinance violations in downtown St. Louis during Fair St. Louis July 2 through July 4, 2004 who would perform community service in order to secure release.

75.     On information and belief, Defendants City and St. Louis Metropolitan Police on July 3 and July 4, 2004, released to the custody and supervision of Defendants Downtown CID/Partnership those individuals arrested for alleged quality of life ordinance violations in downtown St. Louis during Fair St. Louis July 2 through July 4, 2004 who took community service in order to secure release.

76.     On information and belief, Defendants Downtown CID/Partnership, by and through it employees and agents, on July 3 and July 4, 2004 took custody of and supervised those individuals arrested for alleged quality of life ordinance violations in downtown St. Louis during Fair St. Louis July 2 through July 4, 2004 who performed community service in order to secure release.

Plaintiff Chad Johnson

77.     On July 3, 2004 in the early evening, Plaintiff Chad Johnson was walking from a social service agency to the homeless shelter where he was staying in downtown St. Louis.  He stopped to talk with a friend behind the Public Library's Central West building.  He observed 3 vehicles stop behind the main building of the Public Library where some people were gathered, and then he heard firecrackers.  He heard the sound of firecrackers coming from behind the main library building.  He saw an officer go over and throw a firecracker directly at the people sitting on the ledge at the back of the main library building.  One of the people gathered behind the library began to run, and he heard someone shout "Police!" "Stop."  Plaintiff Johnson observed the person who threw the firecracker and some of the others who had pulled up in the vehicles appear to identify themselves as police officers and start placing handcuffs on the individuals who had been gathered behind the library.

78.     One of the cars that had been behind the main library building then drove over to where Mr. Johnson and his friend were, and the driver suggested that they should leave the area.  Before they could do so, the passenger in the car threw a firecracker over the car at Plaintiff Johnson and his friend, and it landed near Johnson and between the feet of his friend.  Mr. Johnson was frightened that the fireworks would harm him and his

friend by catching their clothes on fire and causing them to suffer burns.  Plaintiff Johnson understands that his friend is a homeless Vietnam Veteran who lost his arm in the war.  Johnson went over to report to the other officers that a firecracker had been thrown at him and his friend, whereupon he was arrested and handcuffed.   On information and belief, Defendant Drago and/or John/Jane Does 1 - 25 arrested Johnson.

79.     Plaintiff Johnson was placed in a van with 2 other people and taken to the police station on Jefferson.  While he was at the police station, Mr. Johnson saw the man who threw the firecracker at him and pointed him out to the person who was processing him.  The booking officer then gave the paperwork to that man, indicating that he should complete the paperwork because he had thrown the firecracker at Johnson.  The name of the officer signing the police report/summons is Defendant Drago.  The report says that Johnson was drinking in public.  Johnson refused to sign the report because he was not drinking.  Johnson offered to take a breathalyzer test, but none was administered. Plaintiff Johnson and other individuals were taken to the Justice Center later the night of July 3, 2004.  Johnson was held there overnight and had to sleep on the floor without a mat or blanket.

80.     The next morning, Sunday, July 4, 2004, Mr. Johnson was awakened and told to get ready to leave.  In the lobby of the Justice Center, officers told him and others that a city judge had said they could be released if they did 8 hours of community service work, or otherwise they would be held until Tuesday, July 6, 2004.  Johnson felt coerced into doing the community service, in part because he had to go to work at 8 a.m. on Tuesday, July 6 and did not want to lose his job.  Johnson and approximately 14 other individuals were turned over to 3 people in yellow shirts with the letters "CID" on them.

One of those CID people took Johnson and the others in a van labeled Downtown Community Court to Lucas Park.  They were told to sign a list so the court would give them credit for the community service.  They were issued green vests and ordered to pick up trash.  Johnson worked picking up trash in Lucas Park and in the park area from Tucker to Union Station for approximately 6 hours on July 4, 2004.

81.     Plaintiff Chad Johnson did not go before a judge, much less receive any adjudication of guilt, before he performed the community service work, and he was not paid for that work.

82.     On October 11, 2004, the drinking in public charge against Johnson was dismissed by the municipal court judge.

Plaintiff Kenneth Tate

83.     On June 27, 2004, Plaintiff Kenneth Tate, a veteran of the United States Marine Corps who served in Vietnam, was playing his trombone on Market Street in front of the post office in downtown St. Louis when police were summoned to remove him.  Mr. Tate has a permit (No. S-37306) to play music outdoors in public places in the City.  He plays his music as his employment.

84.     Defendant John Doe 1 and another St. Louis Metropolitan Police officer approached him.  A police cruiser arrived with other police officers.  Although Mr. Tate displayed his permit for playing music, he was arrested by Defendant John Doe 1 and the other officer.

85.     Defendant John Doe 1 and the other officer took Mr. Tate's wallet, including his Medicaid and Medicare cards.  Defendant John Doe 1 threatened harm to Plaintiff Tate.

23

86.     Mr. Tate was placed in a police cruiser, and he was driven to First Street and Mullanphy Street.  Other officers, including Defendant John Doe 1, followed in their police cars.  Mr. Tate was frightened that the police were going to beat him.  At First and Mullanphy streets, Tate was told by one of the officers that they were going to cut him some slack.  He was told to get out of the police cruiser.  His belongings were thrown into the street, and one officer said, "Have at it."  The police then drove away, leaving him to walk back downtown carrying his trombone, cooler bag, horn stand and other possessions.  Plaintiff Tate was never charged with any crime in connection with this arrest.

87.     Mr. Tate returned to the site of his arrest to look for his wallet and health care cards, but did not find them.

Plainitffs John Brinkman and William Tolliver

88.     On the afternoon of July 3, 2004, Plaintiffs John Brinkman and William Tolliver were in front of the Seven-Eleven store on North 17th Street getting ready with another acquaintance to take a bus to a friend's house for a July 4th holiday celebration.  While they were waiting, Plaintiff Tolliver went into the store to get change for the bus and also bought some peanuts.

89.     Plaintiff Brinkman observed three men get out of a white unmarked van in front of the store.  Because they looked as if they had bad intentions, Brinkman walked away.  Two of the men followed Brinkman.  He was grabbed from behind, spun around, punched in the chest by one of the men, thrown to the ground face first, handcuffed, and then thrown in the back of the van.  On information and belief, Defendants Coats and/or John/Janes Does 1 -25 arrested Brinkman.  Plaintiff Brinkman did not accost, assault,

24

resist, or otherwise provoke the beating delivered upon him by Defendants Coats and/or John/Janes Does 1 -25.  Plaintiff Brinkman did not commit any offense, or threaten, strike, resist or otherwise provoke Defendants Coats and/or John/Janes Does 1 - 25 to use any level of force against him, much less the excessive, vicious, and brutal level of force that they applied.  As he was being thrown in the van, Plaintiff Brinkman asked one of the men if they were police, and the man responded in the affirmative.  Until that point, none of the men had identified himself as a police officer.

90.     When Plaintiff Tolliver came out of the store, he saw two men slamming Plaintiff Brinkman to the ground.  Tolliver ran over to see what was happening.  He saw that the men were Police officers.  One of the officers knocked Tolliver's peanuts out of his hand, spun him around, and handcuffed him with a plastic tie.  On information and belief, Defendants Davenport and/or John/Jane Does 1 - 25 arrested Tolliver.  Plaintiff Tolliver was thrown into the back of the van along with Plaintiff Brinkman and their other friend.  Defendants Davenport and/or John/Jane Does 1 - 25 left Plaintiff Tolliver's bag at the scene of his arrest.

91.     Plaintiffs Brinkman and Tolliver were taken to the police station on Jefferson.  Plaintiff Brinkman was asked to sign a summons charging him with drinking in public at 601 Market Street, but he refused because he had not been drinking in public, much less at Market Street.  Plaintiff Tolliver was also charged with drinking in public, but he was not drinking either.  After several hours, they were transported to the Justice Center where they were confined overnight.  On the morning of July 4, 2004, Plaintiffs Brinkman and Tolliver were escorted into a large room at the Justice Center with a number of other prisoners. A uniformed officer told them and the others that they could

be released if they did community service.  When Brinkman was allowed to leave the Justice Center, there were no officers or anyone else to tell him where to go for community service, so he left.  A female Police officer indicated to Tolliver that he was released.

92.     Plaintiff Brinkman had bruises on his chest and side from being punched and thrown to the ground, suffered soreness in his chest for several days afterward, and had welts on his wrists from the plastic ties.  The plastic radio that he had been carrying in his pocket was smashed.  When he retrieved his bags from the station on Jefferson, an unopened bottle of rum that he had intended to take to the party was missing and a can of beer had been placed in his bag.  Mr. Brinkman was so afraid and traumatized by the beating that he hid in the tunnels underneath downtown St. Louis for two days after he was released from jail and would not talk to anyone about what had happened.  He was suspended from his job at McMurphy's Grill because he missed work while he was in jail and in hiding.

93.     When Mr. Tolliver was released, he went back to the Seven-Eleven to look for his bag.  The store manager indicated that he had taken the bag to the police station on Jefferson.  Tolliver recovered his bag at the station, but a package of cold pills was missing from the bag and some books and the bag itself had been ruined by being soaked with a liquid that smelled like alcohol and had damaged the bag's lining.

94.     On or about December 16, 2004, Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charge against Brinkman.

95.     Defendant City of St. Louis entered a nolle prosequi on the drinking in public charge against Tolliver.

Plaintiff John Edwards

96.     Plaintiff John Edwards is veteran of the United States Army.

97.     On the mornings of October 4 and October 5, 2003, Plaintiff John Edwards was in Lucas Park, a public park located in downtown St. Louis close to various providers of homeless services.   On both occasions, a white female St. Louis Metropolitan Police officer told Edwards that he could not be in the Park until after 5:00 p.m. on those days.  On information and belief, there was a house tour in downtown St. Louis on those dates.

98.     On or about October 17, 2003, Mr. Edwards was selling *What's Up* magazine on the corner of Washington Avenue and 13th Street in downtown St. Louis. *What's Up* is a magazine written by and about homeless people and topics relevant to them.  Edwards and other homeless people buy multiple copies of the magazine from the publisher for twenty-five cents a piece and then resell them to the public.  The vendor gets to keep whatever the buyer pays for the magazine, usually a suggested donation of one dollar each.  *What's Up* has a solicitation permit from the City, and Mr. Edwards and other homeless vendors have licenses from the City to sell the magazine.  Despite the fact that Edwards had a license from the City of St. Louis to sell the magazine, on information and belief Officer Eddie Brown, a St. Louis Metropolitan Police officer, told him that he had to get off the corner, that he could not sell magazines there, and that he had to go west of Jefferson Avenue.

99.     On July 3, 2004, at approximately 4:30 p.m., Plaintiff John Edwards was arrested in downtown St. Louis at the corner of Tucker and Lucas where he was walking with a friend.  On information and belief, Defendants Wren and/or John/Jane Does 1 - 25

arrested Edwards.  Mr. Edwards was confined at the Justice Center and not released until July 4, 2004.  He was not charged with any crime at the time of his arrest or before his release.

100.    On September 20, 2004, during the lunch break in the temporary restraining order hearing in this matter, one of Defendants John/Jane Does 1 - 25, an African-American St. Louis Metropolitan Police officer, approached, arrested, and placed Plaintiff Edwards in handcuffs as Edwards was leaving the Globe drug store at Tucker and Spruce streets where he had gone to buy cigarettes.  The police officer took Edwards to the police headquarters building on Clark Street and detained him there for two hours or so.  The officer gave him no reason for his arrest, did not fingerprint or book him, and did not issue him a summons.  Among other things, the officer told Edwards that "you guys are over there telling lies about the police department" and that "you are done downtown."  Edwards felt threatened and did not return to court where he had been scheduled to testify.

Plaintiff Harold Jackson

101.    In the early evening of July 3, 2004, Plaintiff Harold Jackson, a veteran of the United States Army, and a friend were on the sidewalk near the downtown library. They had left Fair St. Louis because it had started to rain, and they were eating bag lunches they had prepared to take with them to the Fair.  Jackson heard a loud noise like a shot gun and turned around to see unmarked vehicles approaching and fireworks being thrown from one or more of them, apparently at people outside the library and in Lucas Park.

102.    The vehicles stopped and the men who got out told Jackson and others in the area to line up.  One man pulled out his badge and said they were police.  Police officers placed Jackson and the others in hand-cuffs.  On information and belief, Defendants Davenport and/or John/Jane Does 1 - 25 arrested Jackson.  They were taken to a large room at the Jefferson police station that was lined with tables where police officers were interviewing people who had been arrested.  Jackson exercised his right to remain silent when the police tried to question him.  Later that night, Jackson was transported to the Justice Center with other people who had been arrested at the library.

103.    St. Louis Metropolitan Police told Jackson that he was being charged with begging, but he is not sure if he was given a summons.  He was released from the Justice Center on the morning of July 4, 2004 and went to St. Patrick's Center where he remained until mid-afternoon.

104.    At that time, Jackson and a friend left the Center, bought some hot wings, and went to Lucas Park to eat them.  Again, Jackson heard firecrackers, and some of the same vehicles carrying some of the same St. Louis Metropolitan Police officers from the day before pulled up.  On information and belief, Defendants Nerviani and/or John/Jane Does 1 - 25 arrested Jackson on July 4, 2004.  Along with his friend and others in the park, Jackson was hand-cuffed, placed in police cruisers that had arrived near the park, and again transported to the Jefferson Avenue station.  A sergeant at the station said to two of the plain-clothes officers who had arrested Jackson, "That's Mr. Jackson, he's not going to talk to us.  Find somewhere to put him."  When Jackson was told to empty his pockets, he became concerned that one of the officers was trying to plant drugs on him.

105. After Jackson had voiced his concern and was being escorted to a cell, one of the officers began to push him forcefully, leading to an altercation in which Jackson was sprayed with mace, hit in the ribs, and had his shirt ripped off.  The St. Louis Metropolitan Police officers had Jackson remove his shoes and belt and then told him to take off the rest of his clothes.  He was placed in a cell, naked.  Later that night, he was placed in leg shackles and transported naked in a police cruiser to the Justice Center, made to walk naked and shackled from the cruiser to the Justice Center, and placed naked in a windowed observation cell where he remained until a guard on a new shift brought him a t-shirt and jail pants and shoes.  He was subsequently placed in a cell with other men, including Plaintiff Smith and others who were arrested with them.

106. Plaintiff Jackson was released at about 5:30 p.m. on July 5, 2004.  The summons signed by Defendant Nerviani charges Jackson with drinking in public at 501 Pine, but Jackson does not drink alcohol, has been sober for 12 years, and was not arrested at the indicated location.

107. St. Louis Metropolitan Police did not return Jackson's watch, clothing, or the contents of his pockets which included his birth certificate, Social Security and Veterans Administrations cards, and his girlfriend's silver chain.  The police did return his Missouri State ID card, but it was broken into two pieces.

108. On or before October 11, 2004, Defendant City refused the begging charge against Jackson.

109. On October 11, 2004, the drinking in public charge against Jackson was dismissed by the municipal court judge.

Plaintiffs Ronnie Trawick and John Coleman

110.   On July 3, 2004, Plaintiff Ronnie Trawick and Plaintiff John Coleman were sitting at a picnic table at Kiener Plaza in downtown St. Louis.  Two unmarked police vehicles pulled up to the park on the Market Street side.  Six officers, 5 male and 1 female, got out and asked them for identification.  The officers said they would do a warrant check.

111.   One of the officers stated there were no warrants against Trawick or Coleman.  One officer asked if they were going to Fair St. Louis.  Trawick and Colemen indicated in the affirmative, and the officers left.

112.   Approximately 5 to 10 minutes later, 2 of the officers, on information and belief Defendants Nerviani, Bonenberger, and/or John/Jane Does 1 - 25 returned, told Trawick and Coleman to put their hands behind their backs, handcuffed, and arrested them.  When they asked why they were being arrested, one of the officers stated, "We'll think of something."

113.   Plaintiffs Trawick and Coleman were put in a minivan and taken to the corner of 14th and Market streets where they were transferred to a police cruiser in which several other people had already placed.  All of the people in the back of the cruiser were African-American men.

114.   Plaintiffs Trawick and Coleman were charged with drinking in public, taken to the Jefferson police station and then to the Justice Center, and placed in a holding cell.  Neither Trawick nor Coleman was drinking in public.  They were kept at the Justice Center until the next day, Sunday, July 4, 2004.  On the morning of July 4, an officer told a group, including Trawick and Coleman, that they were being released early because a judge said they could be released if they did 8 hours of community service that

same day.  Three men came dressed in yellow shirts which had the letters "CID" on the back of the shirts.  Several names were called and those people went with the CID people.  Plaintiffs Trawick and Coleman did not have their names called, and they were released.

115.    On July 5, 2004, Plaintiff Coleman saw 3 police wagons pull up to Lucas Park and observed approximately 6 police officers arrest everyone in the park, approximately 12 people.  He has witnessed similar sweeps of the park at other times.

116.    Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charges against Coleman.

117.    Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charges against Trawick.

Plaintiff Loyde Henley

118.    On July 4, 2004, Plaintiff Loyde Henley was in Lucas Park in downtown St. Louis in the late afternoon.  He had some food he had received from a shelter, and also had with him his personal belongings, including prescription medication for a heart condition.

119.    At about 5:45 p.m. on July 4, 2004, approximately 6 plainclothes police officers came into the park.  They had guns and radios.  The police officers ordered everyone in the park, approximately 10 people, to stand in a certain spot.  The police put Mr. Henley and the others in the park into police cruisers and took them to the police station, then to the jail.  Henley was forced to leave his bags and medicine in the park.

120.    Police checked for any outstanding warrants against Mr. Henley, but found none.  On information and belief, Defendants Nerviani and/or John/Jane Does 1 -

32

25 arrested Mr. Henley for drinking in public.  Henley does not drink alcohol and was not drinking in public.  He asked to take a breathalyzer test, but police refused that request. The summons given to Mr. Henley is directed to an individual named Amos Robinson and refers to an alleged violation at 501 Pine Street.  Mr. Henley does not know who Amos Robinson is and was not arrested at 501 Pine Street.

121.    Plaintiff Henley was held until the next day, July 5, 2004, and released at approximately 6:00 p.m.

122.    Plaintiff Henley told St. Louis Metropolitan Police officers at the jail that he was on medication for his heart and needed his bags with his medicine.  Police told him to "shut up."

123.    A St. Louis Metropolitan Police officer told Mr. Henley that police needed people to clean up the Arch grounds after the fireworks, and that police wanted him to help with the clean-up.  The officer said he had to do it without getting paid.  He refused.

124.    When Plaintiff Henley was released from jail on July 5, 2004, he went back to the park and found that his bags were gone, including his medication, food stamp card, clothes and other belongings.

125.    Because Mr. Henley was confined until the evening of July 5, 2004, he was too late to get into the homeless shelter where he had been staying.  He could not go back to that shelter again for several weeks because he had lost his place there.

126.    On or about December 14, 2004, Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charge against Henley.

Plaintiff Joseph Kitchen

127.    On July 4, 2004, Plaintiff Kitchen was sitting on a bench, with his bag of belongings, in Kiener Plaza downtown eating chicken wings and drinking a soda when an unmarked van pulled up near him.  Three men, who later identified themselves as St. Louis Metropolitan Police officers, got out of the vehicle and approached him. One of the officers pointed to a can of beer on a bench on the other side of the park and asked if it belonged to Kitchen.  When Kitchen said no, the officer said "It does now," and pulled out a police badge.  The Police hand-cuffed Kitchen and then knocked over his soda and spilled his chicken wings to the ground.  The officers were laughing while this action took place.  On information and belief, Defendant Nerviani and/or John/Jane Does 1 – 25 arrested Kitchen.

128.    Plaintiff Kitchen, with his bag of belongings, was transported to a police station on Jefferson Avenue in the van.  On the way, one officer pointed out people who were drinking in public, but the officers said they were not going to stop to pick them up. The officers said they were going to the Seven-Eleven to arrest some people there, but when the van drove past the Seven-Eleven at 17th and Pine, other police officers were already there and so the van drove on to the police station.  Plaintiff Kitchen overheard an officer say that their captain told them to lock up the homeless.

129.    At the police station, one officer asked another what to charge everyone with.   Another officer started pointing at people and randomly assigning charges. Plaintiff Kitchen was charged with drinking in public. He was subsequently transported to the Justice Center.  He was held approximately 23 hours and was released on July 5, 2004.

130.    Plaintiff Joseph Kitchen is employed selling *What's Up* magazine.  He has a license from the City to sell the magazine. When his bag was returned after his release, a candy bar, cookies, and about twenty copies of the magazine were missing.

131.    Plaintiff Kitchen has been told by St. Louis Metropolitan Police that he cannot be in downtown St. Louis.  He has been told by St. Louis Metropolitan Police that he cannot sell *What's Up* magazine on the sidewalks at 6th and Olive streets in downtown St. Louis despite the fact that he has license to do so.

132.    On or about December 16, 2004, Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charge against Kitchen.

<u>Plaintiff Glenn White</u>

133.    On July 2, 2004, Plaintiff White was at the Wendy's restaurant across from Kiener Plaza downtown.  He observed a commotion in the park and saw plain-clothes police officers arrest about 10 African-American people in the park.  The police at first handcuffed the 10 people and then removed the handcuffs while the ten people cleaned the park.

134.    On July 4, 2004, Defendant Russo and another unknown St. Louis Metropolitan Police officer, both dressed in uniform, approached Plaintiff White in an unmarked car. They told him he could not stand outside the Marriott hotel in downtown St. Louis during Fair St. Louis, but that he could come back when it was over.  Plaintiff White then walked to the corner of Fourth Street and Washington Avenue.  The same two officers came up to him again, ran his name through a computer, and found he had no warrants.  They then left.

135.   On or about June 7, 2004, Plaintiff White was walking down 15th Street in downtown St. Louis, past the court building on Olive, carrying a paper bag.  A St. Louis Metropolitan Police officer drove by in a police truck pulling a horse trailer and, seeing White, made a u-turn to come back and talk to him.  He demanded to know what was in the paper bag, found an open can of beer, and arrested White for drinking in public.  On information and belief, Defendant Grimes arrested White.  Plaintiff White was taken to the Justice Center and held for approximately 10 hours.

136.   Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charge against White.

Plaintiff Everett Harris

137.   Plaintiff Everett Harris, a United States Army veteran who served 3 years in Vietnam, was arrested over the 4th of July, 2004 weekend. On July 3, 2004, in the late afternoon or early evening, he was standing near the downtown main library building with a group of 10 or so people.  Several men in street clothes drove up in a van and 2 other vehicles.  One of the men threw firecrackers at Plaintiff Harris and the others.

138.   The men then got out of the vehicles and began putting handcuffs on Harris and others.  On information and belief, Defendants Lance Coats and/or John/Jane Does 1 - 25 arrested Harris.  Plaintiff Harris was taken to the police station on Jefferson, was held there until nearly midnight, and then was transported to the Justice Center.

139.   Plaintiff Harris was not released until about noon the next day, July 4, 2004.  He was charged with drinking in public, but he was not drinking alcohol.

140.   While at the Justice Center, Plaintiff Harris observed some CID personnel single out about 10 people to do community service, but they did not choose Harris.

36

141.    Plaintiff Harris has observed St. Louis Metropolitan Police make homeless people leave Lucas Park and arrest homeless people downtown before major events.

142.    On or about February 1, 2005, Defendant City entered a *nolle prosequi* on the drinking in public charge against Harris.

Plaintiff Sandra Holbrook

143.    On July 3, 2004, Plaintiff Sandra Holbrook was sitting on a wall outside the public library in downtown St. Louis waiting with other homeless people for a mobile outreach van that serves food.  Plainclothes police officers pulled up in an unmarked sport utility vehicle and asked if anyone had any warrants.  They also asked for identification which Holbrook provided.  Plaintiff Holbrook had no warrants. One of the officers said, "The rich people downtown don't want homeless people around."  On information and belief, Defendants Latroy Taylor and John/Jane Does 1 - 25 arrested Holbrook.  She was charged with begging, but she was not begging or engaging in any other unlawful activity.

144.    At the same time that the police were arresting Holbrook and the others, she saw other police throw firecrackers at other people in the area.

145.    Plaintiff Holbrook was taken to the police station on Jefferson and then later transferred to the Justice Center where she was confined until about noon on July 4, 2004.  On the morning of July 4, 2004, a jail official told some other people in custody with Holbrook that a judge said some of them would have to perform 8 hours of community service before they would be released.  Plaintiff Holbrook was not required to do community service and was released.

146.     When Holbrook was arrested, St. Louis Metropolitan Police confiscated her *What's Up* identification badge, vendor's license and duffle bag containing several of the magazines.  Police did not return these items to her when she was released on July 4, 2004.  She had to retrieve them from the police department on Jefferson Avenue on July 5, 2004.  As a result of her unlawful detention, Holbrook was unable to sell her magazines to Fair St. Louis patrons on July 3 and July 4, 2004.

147.     On or about December 10, 2004, Defendant City entered a *nolle prosequi* on the begging charge against Holbrook.

148. On August 5, 2004, Plaintiff Holbrook was in the park adjacent to the downtown public library with several other homeless people.  Two male Police officers on horseback approached them and said it was a "disgrace" for them to take up residency in the park.  The officers told them to leave because it would not look good to people coming downtown for Strassenfest to see homeless people in the park.

Plaintiff Stacy Smith

149.     On the afternoon of July 4, 2004, Plaintiff Stacy Smith was eating hot wings in Lucas Park with Plaintiff Harold Jackson.  They were waiting for Smith's girlfriend to meet them so that they all could go to Fair St. Louis.

150.     After about 20 minutes, Plaintiff Smith heard firecrackers and saw 2 vehicles pull up and park at the corner of the Park.  Two St. Louis Metropolitan Police in plain clothes approached Smith and Jackson.  One officer ordered them to come with the officers and instructed Smith to finish eating because he was going to jail.  The Police Officers began handcuffing Smith, Jackson, and 10 to 15 other people they rounded up from the Park.  When Plaintiff Smith asked the officer about his bag which he had left by

38

the bench, one of the officers said "F___ your bag.  It will be here when you get back."
Smith and the others were loaded into police cruisers that had arrived, and they were
taken to the police station on Jefferson.  Smith later observed Plaintiff Jackson being
escorted from the police station naked, in handcuffs and leg shackles.  When Smith was
subsequently transported to the Justice Center, he also saw Jackson in an observation cell,
still naked.  Later that night, Jackson was placed in the cell with Smith and other men, at
which time Jackson was wearing jail clothes.

151.    Plaintiff Smith was released from the Justice Center at about 5:00 p.m. on
July 5, 2004.  He had been told that he would be charged with drinking in public, but he
was not given a summons before he was released.  He was not drinking alcohol.  He was
in recovery and had been sober for 5 months.

152.    On information and belief, Defendants Nerviani and John/Jane Does 1 - 25
arrested Smith.  The summons that bears Defendant Nerviani's name charged Plaintiff
Smith with drinking in public at 1000 Chestnut, but Smith was arrested a number of
blocks away at Lucas Park.

153.    On or about December 16, 2004, Defendant City of St. Louis entered a
*nolle prosequi* on the drinking in public charge against Smith.

Plaintiff Terry Artis

154.    On the afternoon of July 4, 2004, Plaintiff Terry Artis, along with several
other people whom he recognized as homeless, was sleeping near the public library in
downtown St. Louis.  He was startled awake by a loud boom.  He saw smoke and a large
number of police officers.  The police officers handcuffed Mr. Artis and the other people
near the library, placed them in a police cruiser, and transported them to the police station

on Jefferson.  On information and belief, Defendants Nerivani and John/Jane Does 1 - 25 arrested Artis, charging him with begging.  After a short stay at the police station on Jefferson, Artis was transported to the Justice Center where he remained until he was released.

155.   Defendant City of St. Louis entered a *nolle prosequi* on the begging charge against Artis.

<u>Plaintiff Melvin Burnett</u>

156.  On July 2, 2004, Plaintiff Melvin Burnett observed a St. Louis police officer at the corner of 13th and Washington streets arrest a man whom Burnett knew to be homeless.  The man asked the police officer why the homeless were being harassed, the officer responded "You ain't seen nothing yet."

157.   In August of 2004, Plaintiff Burnett was selling *What's Up* magazine on Broadway.  A St. Louis police officer came up and ordered Mr. Burnett to move from his location even though Burnett had a permit from Defendant City to sell the magazine. Standing right next to Burnett was a man selling Cardinal baseball tickets, but the police officer did not tell him to move, much less arrest him for scalping.

158.   On or about August 5, 2004 at around 4 p.m., Mr. Burnett was in the public park across Olive from the public library.  A St. Louis police officer instructed Burnett that he could not be in the park because of Strassenfest.  Mr. Burnett removed himself from the park as he was ordered.

<u>Plaintiff Steve Dickens</u>

159.   On July 3, 2004, Plaintiff Steve Dickens was sitting on a bench in the public park across from Union Station in downtown St. Louis.  An individual whom

Dickens recognized as homeless warned that he should leave the park because the police were "scooping up" homeless people.  Mr. Dickens started walking out of the park, toward Jefferson.

160.   As Plaintiff Dickens walked along Market Street toward Jefferson, a van drove up and 2 St. Louis Metropolitan Police officers got out, one of whom was carrying a handful of plastic handcuffs.  The officer with the handcuffs approached Mr. Dickens. When Dickens asked what he had done wrong, the officer told him not to worry about it, handcuffed him, and directed him to get into the van.  On information and belief, Defendants Coats and John/Jane Does 1 - 25 arrested Dickens.  According to the summons that bears Defendant Coat's name, Plaintiff Dickens was arrested for drinking in public at 501 Pine, but Defendant Coats arrested Dickens nearly fifteen blocks away on Market Street near Union Station.

161.   After Mr. Dickens had been placed in the van, one of the Police officers appeared to be using a walkie-talkie and Mr. Dickens heard someone say that "we've got a bunch of niggers in hobo park and hanging around the library" and something about going to "round 'em up."  The officers then drove the van to Lucas Park, picked up several people whom Mr. Dickens recognized as homeless, and put them in the van. From there, the officers took Plaintiff Dickens and the others to the police station on Jefferson for booking.

162.   The officer who booked Mr. Dickens told him that he could choose whether to be charged with drinking in public or with trespass.  Plaintiff Dickens did not believe he was guilty of either charge since he had not been drinking and had been in a

public place at all times immediately prior to his arrest, but the officer offering the choice said that trespass would take longer so Dickens chose the drinking in public charge.

163.    After being booked, Plaintiff Dickens was taken from the Jefferson station to the Justice Center where he was placed in a cell and held in custody until the afternoon or evening of July 5, 2004.

164.    Plaintiff Dickens has been told by St. Louis Metropolitan Police on other occasions to leave the park across from Union Station and "go hang out somewhere else" at times when the park is open to the public, to "move on" or "get moving" when he is waiting for a bus at a bus stop, and to "walk faster" even when he is complying with a direction to move.

165.    On or about February 1, 2005, Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charge against Dickens.

Plaintiff Tanya Finch

166.    On July 3, 2004, Plaintiff Tanya Finch and her boyfriend walked to a bus stop on Market Street near Savvis Center/Kiel Auditorium to catch a bus to her new apartment.  Ms. Finch observed 2 or 3 other people already at the bus stop when she arrived, all of whom were drinking beer out of cans.  Neither Ms. Finch nor her boyfriend drank any beer or had a beer can at or near the bus stop.

167.    While Ms. Finch and her boyfriend were waiting for the bus, a minivan-type vehicle pulled up in front of the bus stop.  One white female and approximately 3 or 4 white male St. Louis Metropolitan police officers got out of the van and came up to the bus stop.  The officers all had name tags but were wearing street clothes.  The officers said that they had received a call that people were drinking at the bus stop.

168.    The St. Louis Metropolitan Police officers asked everyone at the bus stop for identification.  Ms. Finch's identification was in a white plastic trash bag sitting next to her at the bus stop.  She was moving into a new apartment and had sheets, covers, clothes, and other items, including her purse, in the bag.  When she attempted to retrieve her identification from the bag, the female police officer ordered her not to touch the bag.

169.    Plaintiff Finch and the other individuals at the bus stop were handcuffed and told that they were being arrested for drinking in public.  On information and belief, Defendants Kelly Fisher and John/Jane Does 1 - 25 arrested Finch.  Ms. Finch had not been drinking and informed the officers of that fact.  The officers placed Ms. Finch and the others in a police cruiser, and they were taken to the Jefferson police station.  At the station, Ms. Finch asked to take a breathalyzer test and to use the phone to call her mother, but both requests were refused.

170.    Later that evening, Plaintiff Finch was transported from the Jefferson police station to the Justice Center where she was placed in a cell and confined there until the morning of July 4, 2004.  At that time, Ms. Finch was escorted into a large room at the Justice Center with a number of other prisoners.  A uniformed officer called names off a list and told the people whose names were called that they were going to clean up the park.  Ms. Finch's name was called.  She was made to wear a vest, given a trash bag, taken to a park, and told to pick up trash.  She was told to walk to another park in the area and to continue picking up trash in the park.  Ms. Finch cleaned up trash in the park areas until the early afternoon on July 4, 2004.  She was released from the park and had to walk to the police station at Jefferson to retrieve her bag.

171.    Plaintiff Tanya Finch did not go before a judge before she performed the community service work, and she was not paid for that work.

172.    On or about November 12, 2004, Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charge against Finch.

<u>Plaintiff Frederick Higgins</u>

173.    On the evening of July 3, 2004, Plaintiff Frederick Higgins and his wife were arrested by St. Louis Police for drinking in public in the park across from Union Station.  They were taken first to the police station on Jefferson and later in the evening to the Justice Center.  Plaintiff Higgins was confined in jail until the following morning.

174.    On the morning of July 4, 2004, Mr. Higgins was brought from his cell into a large room with a number of other prisoners.  An officer called off a list of 10 or 15 names, including that of Mr. Higgins.  The officer informed them that a judge had said that they could be released if they did community service, but if they did not perform community service, they would remain in jail until July 6, 2004 when court would be open.  Mr. Higgins felt coerced into doing community service because he did not want to remain in jail.  Mr. Higgins and the others were taken to clean up the park between the library and New Life Evangelistic Center and then the park area from Tucker to Union Station.

175.    Plaintiff Frederick Higgins did not go before a judge, much less receive an adjudication of guilt, before he performed the community service work, and he was not paid for that work.

176.    On October 11, 2004, the drinking in public charge against Higgins was dismissed by the municipal court judge.

Plaintiff Van Hunnicutt

177.   On the afternoon of July 4, 2004, Plaintiff Van Hunnicutt was standing at the bus stop near the downtown library waiting for a bus to take him down to the Fair St. Louis area.  A van pulled up to the bus stop, and firecrackers were thrown from the van at the people at the bus stop.  Four police officers then got out of the van and 2 other officers emerged from a nearby car, all displaying their badges and guns and instructing the people at the bus stop not to run.  One of the police officers placed handcuffs on Mr. Hunnicutt.  On information and belief, Defendants Drago and John/Jane Does 1 – 25 arrested Hunnicutt.  On information and belief, Defendant Drago or John/Jane Does 1 - 25 took Mr. Hunnicutt's bus pass, crumpled it up, threw it on the ground, and said "you won't be needing this."  Neither Defendant Drago nor John/Jane Does 1 - 25 told Mr. Hunnicutt why he was being arrested.  When he asked what the charges were, an officer told him he would find out when he got to the station.  According to the summons that bears Defendant Drago's name, Drago arrested Plaintiff Hunnicutt for begging at 501 Pine, but Plaintiff Hunnicutt was arrested at least 8 blocks away near the downtown library.

178.   Along with approximately 12 other people who were arrested in the same vicinity, Plaintiff Hunnicutt was transported in the van to the police station on Jefferson. During the ride to the station, Mr. Hunnicutt overheard St. Louis Metropolitan Police officers commenting that they were going to "beat their quota" and "do even better than yesterday."  He also saw officers exchanging "high-fives" regarding the number of people they had arrested.  At the station, Mr. Hunnicutt observed Police officers eating

pizza and overheard a comment to the effect that the sergeant had bought the officers pizza because they were doing so well.

179.    Plaintiff Hunnicutt was held for approximately 2 or 3 hours at the Jefferson station.  He still was not informed of the charges against him.  During his time at the station, he saw another arrestee who was completely naked.  Mr. Hunnicutt overheard the naked arrestee tell officers to stop harassing him and an officer respond to the effect that they would stop harassing him if he stopped sitting in the park.

180.    Hunnicutt was transported to a jail downtown where he was confined for many hours.  When he was released, he was informed for the first time that he was charged with begging.  Plaintiff Hunnicutt had not approached anyone to ask for anything at or near the time of his arrest.

181.    Defendant City of St. Louis entered a *nolle prosequi* on the begging charge against Hunnicutt.

Plaintiff Patricia Jordan

182.    On July 2, 2004, in the early evening, Plaintiff Patricia Jordan was sitting on a brick wall near the Bank of America building at Broadway and Pine in downtown St. Louis, eating food that a friend had bought for her.  Her husband was across the street selling baseball tickets.  When she saw her husband being handcuffed and arrested, she ran across the street to find out what was going on.  A St. Louis Metropolitan Police officer told her that they would arrest her if she did not leave, so she did so.  She walked south on Broadway toward the Marriott hotel in order to tell a friend of her husband's that he had been arrested.

183.    Plaintiff Jordan then turned around and began walking north on Broadway on the opposite side of the street from where her husband had been arrested. When she neared that spot, a Police officer ordered Jordan to cross the street and come back over to where they had her husband. She complied. The Police officers who arrested her husband had been joined by other St. Louis Metropolitan Police officers, and one of the Police officers directed her to sit on the sidewalk next to her husband and then placed her in handcuffs. Her husband asked why she had been arrested, and one of the officers said that they would find out later. On information and belief, Defendants Lila Payne and/or John/Jane Does 1 - 25 arrested Patricia Jordan.

184.    Ms. Jordan was then placed in one of 2 white police vans that had arrived at the scene, and, after being driven around for awhile, she was taken to the police station on Jefferson. There she learned that she was being charged with street demonstration, but she had not engaged in any activity that had resulted in a gathering or stopping of persons or vehicles so as to impede pedestrians or vehicular traffic. Later that evening, Ms. Jordan was transported to the Justice Center when she was confined overnight. On the morning of July 3, 2004, a man with a badge and white shirt told her that a judge had said she could either do 8 hours of community service and be released or remain in jail until after the holiday. Jordan felt coerced into doing the community service because she was frightened and did not want to remain incarcerated.

185.    At approximately 8:00 a.m. on July 3, 2004, Plaintiff Jordan was processed for release and then she and other individuals were escorted by the same man with a badge and white shirt to the main entrance where they were turned over to 2 CID employees to do community service. One of the CID employees told them that, because

they were doing community service now, they would not have to come to court.   Along with about 8 other people, Ms. Jordan was driven in a DCC van to the White Castle on Broadway and made to pick up trash on Broadway and under the bridges.  From there, Ms. Jordan and the others were taken to a park at 15th and Pine streets.  They ate lunch at 15th and Park at around noon, but before they could be taken to another location to pick up more trash, it began to rain.  Ms. Jordan was released from performing community service at that time.

186.    Plaintiff Patricia Jordan did not go before a judge, much less receive an adjudication of guilt, before she was made to pick up trash, and she was not paid for that work.

187.    On October 11, 2004, the street demonstration charge against Jordan was dismissed by the municipal court judge.

188.    On November 8, 2004 in the late afternoon or early evening, Plaintiff Jordan was at Kiener Plaza in downtown St. Louis getting food from a church group that regularly distributes food there to the homeless.  The church group provided her with milk, special food, and vitamins that they had brought especially for her because she was pregnant.  One of the men from the group also gave Ms. Jordan several dollars for bus fare to get her and her husband to her doctor's appointment the next morning.  After she had gotten food and spoken with the church group people, she walked on Market toward Broadway to catch a bus back to a shelter.

189.    On information and belief, a St. Louis Metropolitan Police officer emerged from a car parked along Market, stopped Jordan, and accused her of begging. Although Ms. Jordan explained that a friend from the church group had given her money,

the Police arrested her for begging, on information and belief without interviewing anyone from the church group, and then released her on a summons for a December 21, 2004 court date.   On information and belief, Defendant DuBach arrested Jordan for begging.

190.    On or about December 21, 2004, Defendant City entered a *nolle prosequi* on the begging charge against Jordan.

Plaintiff Keith Loyd

191.    On July 3, 2004, in the early evening, Plaintiff Keith Loyd was sitting on a ledge behind the main public library in downtown St. Louis. An unmarked van pulled up in front of Mr. Loyd and other individuals who were also behind the library and whom Mr. Loyd recognized as homeless. Approximately 4 to 6 St. Louis Metropolitan Police officers in plain clothes, with badges on chains around their necks, got out of the van. The officers asked the individuals for their identification and whether they had warrants. One of the officers took the individuals' identification over to a marked Police car that had subsequently pulled up alongside the van.

192.    The Police officers then began arresting Mr. Loyd and the other people, using white, plastic bands to handcuff them.   On information and belief, Defendants Nerviani and/or John/Jane Does 1 - 25 arrested Loyd.  Mr. Loyd and other individuals were placed in a marked police van which had subsequently arrived. Mr. Loyd heard what sounded like firecrackers in the area.  Plaintiff Loyd was taken to the police station on Jefferson and was booked. He was charged with begging, although he was not begging. He was transported to the Justice Center later that night.

193.    The next morning at the Justice Center, Plaintiff Loyd was asked if he wanted to complete community service in order to be released. He was later told that there were enough people to complete community service, but he was released anyway.

194.    On or about December 10, 2004, Defendant City of St. Louis entered a *nolle prosequi* on the begging charge against Loyd.

Plaintiff Luster Reynolds

195.    On July 4, 2004, Plaintiff Luster Reynolds was sitting on a park bench in the vicinity of the Civil Courts building.

196.    Approximately 3 police officers dressed in plain clothes and wearing jackets with police logos approached Plaintiff Reynolds, directed him to get up, and searched him.   The officers asked Plaintiff Reynolds for identification, which he produced, and they told him they were going to check for outstanding warrants. Although Plaintiff Reynolds had no warrants and the officers' search of him had revealed nothing, he nonetheless was arrested.  On information and belief, Defendants Strohmeyer and John/Jane Does 1 - 25 arrested Reynolds.

197.    Plaintiff Reynolds was taken to the police station on Jefferson and later transferred to the Justice Center, where he was placed in a cell and held in custody until July 5, 2004.

198.    Mr. Reynolds was charged with begging; however, Plaintiff Reynolds had not been begging at the time, nor was he engaging in any other illegal activity.

199.    Defendant City of St. Louis entered a *nolle prosequi* on the begging charge against Reynolds.

Plaintiff Milton Ross

50

200.    In the afternoon of July 3, 2004, Plaintiff Milton Ross was sitting on a low wall near the Board of Education building with his feet resting on the public sidewalk. The Board of Education is located behind St. Patrick Center where Mr. Ross had walked for lunch.   A green car pulled up in front of Mr. Ross, and 2 St. Louis Metropolitan Police officers got out and approached him.   The Police officers did not ask Mr. Ross if he had permission to sit there, nor did they tell him to move on.   Instead, the Police stated that he was trespassing, which Mr. Ross denied.   Defendant Robert Ernst placed him in handcuffs and arrested him.   Defendant Ernst and his partner took Mr. Ross to the police station on Jefferson.   Mr. Ross was charged with trespassing.   Later than evening, Mr. Ross was transported to the Justice Center.   Mr. Ross was released from the Justice Center on the morning of July 4, 2004.

Plaintiff Timothy Swift

201.    On the afternoon of July 4, 2004, Plaintiff Timothy Swift was sitting with several other homeless individuals under a bridge on Hickory Street watching the air show during Fair St. Louis.   Across the street, a small group of adults and children had assembled next to the liquor store with their chairs and coolers also to watch the air show. Plaintiff Swift did not recognize any of that group as homeless, and they had driven in vehicles to that location.   It appeared that some in the group were drinking a variety of alcoholic beverages, including beer and wine.

202.    A white van pulled up under the bridge, and Mr. Swift and his acquaintances walked down to it because they thought it was the church van that regularly brings food to that location.   When they got near the van, Plaintiff Swift saw 3 men with badges and guns.   The Police told Plaintiff Swift and the others to get back, so

they returned to the spot under the bridge where they had been sitting.  The Police then approached Plaintiff Swift and his companions and asked why they had not left the area. When Mr. Swift picked up his belongings to leave, the Police announced that they were under arrest.  On information and belief, Defendants Drago and/or John/Jane Does 1 - 25 placed Mr. Swift in handcuffs and arrested him.  When Swift asked why he was being arrested, Defendants Drago or John/Jane Does 1 - 25 said "I could give you a drinking in public, I could give you a p-----g in public, I'm the police, I've got a badge and a gun, I can do what the f--- I want to do."  Mr. Swift was charged with drinking in public, but he had not been drinking alcohol at the time, nor was he engaging in any other illegal activity.  Defendants Drago or John/Jane Does 1 - 25 did not bring Mr. Swift's personal property with him.

203.    The Police put Plaintiff Swift and his companions in the van.  They did not talk to, much less arrest, any of the group on the other side of street.  The Police drove Plaintiff Swift and the others around for a while in the van.  At the Hickory and Broadway location and at other times as they were driving around, Mr. Swift heard firecrackers near the van and the police laughing.  At some point, the Police drove to the Kiener Plaza area, where Plaintiff Kitchen was placed in the van and also to the Seven-Eleven store where 2 more men whom Swift recognized as homeless were placed in the van.

204.    The Police then took Plaintiff Swift to the police station on Jefferson.  At the station, Swift overheard an officer state something to the effect that a sweep of the homeless was underway and that the Police were meeting or exceeding their quota. While Plaintiff Swift was in a cell at the station on Jefferson, he saw a naked African-

American man being placed in another cell.  Plaintiff Swift was subsequently taken to and confined at the Justice Center, from which he was released on the morning of July 5, 2004.  He returned to the area where he was originally arrested to recover his jug, jacket, and chair, but they were gone.

205.    On or about December 16, 2004, Defendant City of St. Louis entered a *nolle prosequi* on the drinking in public charge against Swift.

Plaintiff Isabell Wooden

206.    On July 2, 2004, Plaintiff Isabell Wooden was sitting on a bench and talking with 3 other individuals in Kiener Plaza, a public plaza in downtown St. Louis, waiting for a bus.  An unmarked car drove up and several men and one woman got out and approached Wooden's group.  The men and woman were dressed in plain clothes, wore badges, and identified themselves as St. Louis Metropolitan Police officers.

207.    The Police officers asked Plaintiff Wooden's group for identification, and Wooden and the others provided it.  One of the male officers asked Plaintiff Wooden why she was sitting there, and Plaintiff Wooden replied that she was waiting for a bus.   The officer expressed skepticism, even after Plaintiff Wooden explained that the Delmar bus had been re-routed to that location.  The Police officers then conducted warrant checks on Plaintiff Wooden and the others in her group.  Upon learning that some of the others had outstanding warrants, the Police summoned a cruiser to take them in.  Although Plaintiff Wooden did not have any outstanding warrants, she was not given permission to leave.

208.    Plaintiff Wooden was smoking a cigarette at the time.  When she finished, she put the cigarette butt on the ground to put it out.  Upon observing this, and without waiting to see whether Plaintiff Wooden was going to pick up the cigarette after putting it

out, the Police officer who had earlier asked Plaintiff Wooden why she was there instructed the female officer to charge Plaintiff Wooden with littering and arrest her. This same male officer also went on to accuse Plaintiff Wooden of lying about the bus. On information and belief, Defendants John/Jane Does 1 - 25 arrested Plaintiff Wooden and handcuffed her.  Plaintiff Wooden was taken to the Jefferson Street police station for processing and then to the Justice Center, where she was placed in a cell and held overnight.

209.    The next morning, July 3, 2004, an officer at the Justice Center told Plaintiff Wooden that she could be released that day if she performed 8 hours of community service or otherwise she would remain in custody until Tuesday, July 6, 2004. Ms. Wooden felt coerced into doing community service, in part because she was supposed to start a new job at McMurphy's Grill on July 6, 2004.  Plaintiff Wooden was turned over to the control of CID personnel who took Wooden and about 6 others to clean up hobo park, Soldier's Memorial, around 15th and Pine streets, on Washington Avenue from 16th to Tucker, and down Tucker to Pine.  At that point, it began to rain, and they were released before completing 8 hours of work.

210.    Plaintiff Wooden was not given the opportunity to have a trial or otherwise appear before a judge before she performed the community service work, and she was not paid for that work.

211.    On or before October 11, 2004, Defendant City refused the littering charge against Wooden.

212.    The treatment of the Plaintiffs as described above was taken pursuant to an official policy or a practice, custom, and usage that are well established, pervasive, and

continuing and the mutual agreement, conspiracy, and joint action among the St. Louis Metropolitan Police, the City of St. Louis, and Downtown CID/Partnership.

213.    On or about October 13, 2003, David Lewis, who was homeless at the time, was sitting in Lucas Park, eating a peanut butter sandwich and drinking apple juice. A St. Louis Metropolitan Police officer accused him of drinking beer in public, asked him for identification, threatened to spray him with Mace, and handcuffed him while a records check was run.  The officer released Lewis after learning that he had no record. The St. Louis Metropolitan Police officer took Lewis' peanut butter sandwich.

214.    In the fall of 2003, a St. Louis Metropolitan Police officer approached Martin DuBose, who was homeless at the time, while he was sitting in Lucas Park.  The officer told DuBose that he looked suspicious because he was white and that the officer would be keeping an eye on him.  On another occasion in September of 2003, Martin DuBose was sitting in Lucas Park when a St. Louis Metropolitan Police officer accused him of vagrancy, ordered him to leave the Park, and threatened to put him in jail if the officer saw him in Lucas Park again.

215.    On July 3 and July 4, 2004, Mr. DuBose heard and saw firecrackers thrown by St. Louis Metropolitan Police at homeless people near the public library and Lucas Park.

216.    On or about September 30, 2003, Mae Fuller, who was homeless at the time, went to Christ Church Cathedral at 8:00 a.m. to get breakfast.  While Fuller and others were waiting to enter the church for breakfast, St. Louis Metropolitan Police, using a racial slur, told them to get out of the alley and warned them not to be found there

again.  The following morning, a St. Louis Metropolitan Police van was parked outside Christ Church Cathedral.

217.    Approximately two weeks later, Mae Fuller was sitting in Lucas Park waiting for the New Life Evangelistic Center shelter to open when a St. Louis Metropolitan Police officer rolled up on a scooter, told her that she could not wait in the Park, and threatened her with arrest if she did so.  She and other homeless individuals left the Park, and the staff at New Life let them into the shelter ten minutes early.

218.    On at least three occasions, Cecil Purvey, who was homeless at the time, was told by St. Louis Metropolitan Police that he could not be in Lucas Park.  The St. Louis Metropolitan Police also told him that the homeless were not allowed in Lucas Park.  During the summer of 2003, St. Louis Metropolitan Police stopped Purvey on numerous occasions to check his identification, but they never charged him with any violation or crime.

219.    On two occasions during the summer of 2003, St. Louis Metropolitan Police told Wendel Jones that he could not be in Lucas Park.  Wendel Jones was not homeless, but the St. Louis Metropolitan Police believed him to be homeless because, after his work on the early shift, he often ate breakfast in Lucas Park and associated with some homeless individuals who frequent the Park.  Wendel Jones was also stopped by St. Louis Metropolitan Police several times in the summer of 2003 to check his identification.

220.    On July 2, 2004, Larry B. Fryer observed St. Louis Metropolitan police officers pull up to the park near the downtown library main branch in a car and police

wagon.  He observed police arrest four men known to him to be homeless.  Fryer feared arrest and left the area.

221.    Fryer is constantly approached by police, at least once or twice a week, and questioned without probable cause or reasonable suspicion.  On several occasions, police officers have told him that if they see him downtown again, they would "lock him up."

222.    In the spring of 2004, Fryer was walking to the state employment office on Olive Street to get information about job opportunities.  A police officer approached him and said he should leave downtown or be arrested.  Fryer, fearing arrest, did not go to the employment office.

223.    Jerry Hastings was employed in St. Louis as a bricklayer.  On or about Friday, July 9, 2004, at approximately 2:00 p.m., two white police officers arrested Hasting for allegedly tampering with a car.  When the police took his belt and other possessions, they also took his eyeglasses, and one officer intentionally snapped his glasses into pieces.  Hastings was taken to the city jail, held for approximately 20 hours, and then released without being charged.  The police returned his glasses to him, in pieces.  Hastings could not afford new glasses.  Without glasses, he was unable to perform his bricklaying work and lost his job.

224.    Hastings has been told by a female St. Louis Metropolitan Police officer that Laclede's Landing is "off limits" to him.

225.    Harold Brown, a homeless African-American man who uses social services in downtown St. Louis has been told by St. Louis Metropolitan Police that he cannot be in or walk downtown or in Lucas Park.  He is frequently harassed by St. Louis

Metropolitan Police and has had property taken by Police Officers, including his EBT (electronic benefits transfer card), a hat, toiletries, socks, and personal papers and a family photograph.  On July 8 or 9, 2004, Mr. Brown was sitting in the park across from the Post Office on Market Street when a St. Louis Metropolitan Police officer on a bicycle approached him, demanded to and, without Brown's consent, did search his bag which only contained his lunch.  The Police Officer also used a profanity in addressing Mr. Brown.

226.    Unless Defendants are immediately, preliminarily, and permanently enjoined from removing homeless and homeless-appearing people from downtown St. Louis and discouraging homeless people and homeless-appearing people from remaining in the area by taking Plaintiffs and other homeless and homeless-appearing people into custody and jailing them without reasonable suspicion, probable cause, or lawful authority; holding them in custody without efforts to obtain a warrant; transporting such individuals away from certain areas of the City and abandoning them; unreasonably seizing and destroying their personal property; directing them to remove themselves from Lucas Park, Washington Avenue, Locust Street, Kiener Plaza, Laclede's Landing and other downtown public areas when they are engaged in lawful activity, and subjecting them to forced labor before they have been found or pled guilty, Plaintiffs and other homeless and homeless-appearing people will continue to suffer irreparable harm, including violation of their constitutional rights, gross indignities, severe emotional and psychological distress, humiliation, embarrassment, anguish, and anxiety.  There is no relief at law adequate to remedy the harms suffered by Plaintiffs and to prevent the continuing and repeated infliction of these harms.

## V.    CLAIMS FOR RELIEF

### COUNT I

### POLICY AND/OR PRACTICE AND CUSTOM OF REMOVING HOMELESS PEOPLE FROM DOWNTOWN ST. LOUIS DIRECTED AGAINST THE ST. LOUIS POLICE BOARD COGNIZABLE UNDER 42 U.S.C § 1983

For their causes of action against Defendants Freeman, Rollins, Saracino, Quinn, and Slay ("St. Louis Police Board") in Count I, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden state:

227.    Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden incorporate by reference each and every allegation and averment in paragraphs 1 through 226 of this First Amended Complaint as though fully set forth herein.

228.    There exist and have existed at all times relevant within the St. Louis Metropolitan Police Department and, on information and belief and with reasonable opportunity for further investigation and discovery, the City of St. Louis official policies or customs, practices and usages so pervasive that they constitute the policy of the Department and City which have caused and will continue to cause the constitutional deprivations suffered by the Plaintiffs as have been more fully set forth herein.

229.    The policies, customs, practices, and usages that exist and have existed are to remove homeless and other homeless-appearing people from downtown St. Louis and discourage them from remaining there by:

a.  stopping, detaining, and arresting homeless and homeless-appearing people in downtown St. Louis without probable cause, reasonable suspicion, or lawful excuse or justification;

b.  forcing homeless and homeless-appearing people to move on from public parks, sidewalks, and other public areas in downtown St. Louis without lawful excuse or justification and warning them that certain areas of downtown St. Louis are off-limits to them because of their homeless status;

c.  seizing and destroying the personal property of homeless and homeless-appearing people without probable cause, reasonable suspicion, or lawful excuse or justification;

d.  arresting and confining homeless and homeless-appearing people for up to and in excess of 20 hours without a warrant and without undertaking to obtain one;

e.  hindering and preventing, without lawful excuse or justification, homeless people from exercising the rights and engaging in the activities authorized by proper licenses and permits from the City of St. Louis;

f.  forcing homeless or homeless-appearing people to perform manual labor picking up trash in downtown St. Louis before they have been found or entered a plea of guilty;

g.  coercing homeless or homeless-appearing people into performing manual labor picking up trash in downtown St. Louis by the use or threat of physical restraint, confinement, or continued confinement

h.  ratifying misconduct of police officers by failing to correct or discipline officers who engage in misconduct.

230.  The policies, practices, customs, and usages of removing homeless and homeless-appearing people and discouraging them from remaining in downtown St. Louis by stopping, detaining, and arresting them, by confining them in jail for any longer than needed to obtain a warrant, and by seizing and destroying their personal property, all without probable cause, reasonable suspicion, or lawful excuse or justification, violate

Plaintiffs' rights to be free from unlawful seizure of their person and property under the Fourth and Fourteenth Amendments to the United States Constitution.

231.    The policies, practices, customs, and usages of removing homeless and homeless-appearing people and discouraging them from remaining in downtown St. Louis by forcing homeless and homeless-appearing people to remove themselves from public parks and other public areas without lawful excuse or justification and warning them that certain areas of downtown St. Louis are off-limits to them because of their homeless status violate Plaintiffs' rights to be, move, and stay put in public places for lawful purposes under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

232.    The policies, practices, customs, and usages of removing homeless and homeless-appearing people and discouraging them from remaining in downtown St. Louis by forcing and coercing them to perform manual labor under threat of confinement before an adjudication of guilt violate the rights of Plaintiffs Johnson, Finch, Higgins, Jordan, and Wooden under the Thirteenth and Fourteenth Amendments to the United States Constitution to be free from involuntary servitude and punishment without a judicial determination of guilt.

233.    The St. Louis Police Board is vested with the authority and has the duty to screen, train, supervise, discipline, and otherwise control the officers of the St. Louis Metropolitan Police Department.  The Board has effectively abrogated or delegated the power to so screen, train, supervise, discipline, and control the officers of the St. Louis Metropolitan Police Department working in downtown St. Louis by failing to act in the face of transgressions of which the Board knew or should have known.  As the lawfully

designated policymaking body for the St. Louis Metropolitan Police Department, the Board has the power and responsibility to prevent the existence of the policies and practices described above and has failed and refused to do so.  The failure of the St. Louis Police Board to prevent constitutionally violative conduct as described above caused the constitutional deprivations that have been suffered by the Plaintiffs.

234.    The failure of the St. Louis Police Board, as the policymaker for the St. Louis Metropolitan Police department, to act affirmatively in the face of transgressions about which they knew or should have known establishes the policy of the St. Louis Metropolitan Police Department to engage in, condone, and  otherwise tolerate the constitutionally violative conduct alleged in this complaint.  Had the Board acted affirmatively and properly to train and supervise officers of the St. Louis Metropolitan Police Department and to discipline the officers when the officers conducted themselves in constitutionally violative ways, the constitutional deprivations suffered by the Plaintiffs would not have occurred.

235.    The St. Louis Police Board is on notice, actual or constructive, of the practice of improperly detaining and arresting homeless and homeless-appearing people in downtown St. Louis, forcing homeless and homeless-appearing people to remove themselves from public parks and other public areas and warning them that certain downtown areas are off-limits to them because of their homeless status, seizing and destroying the personal property of homeless and homeless-appearing people, taking homeless and homeless-appearing people out of their location and abandoning them, confining homeless and homeless-appearing people for up to and in excess of 20 hours without a warrant and without undertaking to obtain a warrant, preventing homeless

62

people with proper licenses and permits from engaging in the authorized activities, and forcing homeless and homeless-appearing people to perform manual labor under threat of confinement and without seeing a judge because Plaintiffs' counsel notified Commissioner Slay and Chief of Police Mokwa of this practice.  Nevertheless, the St. Louis Police Board did nothing to prevent or stop the practice.

236.    In their failures described above, the St. Louis Police Board intentionally disregarded known facts or alternatively was deliberately indifferent to a risk of the constitutional violations of which they knew or should have known and their culpability caused the constitutional violations suffered by the Plaintiffs.

237.    As a direct and proximate result of the policies, customs, practices, and usages of the St. Louis Police Board as described above, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden suffered intimidation, humiliation, embarrassment, and emotional distress, and Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden suffered mental anguish as a result of the conduct that resulted in deprivation of their Constitutional rights.  Plaintiffs Brinkman, Tate, Henley, Jackson, Kitchen, Smith, Hunnicutt, Swift, and Tolliver suffered damages for the loss of their personal property.

238.    If Plaintiffs prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the

Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden pray that this Court enter an order on Count I:

a.       Declaring that the above-described policies, practices, customs, and usage violate Plaintiffs' rights under the Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution;

b.       Preliminarily and permanently enjoin Defendants Freeman, Goodson, Saracino, Quinn, and Slay, their successors in office, and all those under their control or supervision or who are in active concert and participation with them from carrying out, implementing, maintaining, and enforcing the above-described policies, practices, customs, and usage;

c.       Awarding compensatory damages for each Plaintiff in an amount that is fair, just, and reasonable under the circumstances;

d.       Awarding Plaintiffs their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

e.       Awarding Plaintiffs the costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT II

### SUPERVISORY LIABILITY BASED ON DIRECT PARTICIPATION IN OR DIRECTION OF ACTIVITIES VIOLATING CONSTITUTIONAL RIGHTS

**DIRECTED AGAINST DEFENDANT WARNECKE**
**COGNIZABLE UNDER 42 U.S.C. § 1983**

For their causes of action against Defendant Warnecke in Count II, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden state:

239.    Plaintiffs incorporate by reference each and every allegation and averment in paragraphs 1 through 238 of this First Amended Complaint as though fully set forth herein.

240.    Defendant Warnecke is the commander of the 4th Police District of the St. Louis Metropolitan Police Department and is the highest ranking police officer in that district which encompasses downtown St. Louis.  She is delegated with the power and authority to direct and control the conduct of the officers serving in the Fourth District by Defendant St. Louis Police Board and Chief of Police Mokwa, and Defendant Warnecke has directed and controlled the conduct of the officers serving in the Fourth District.

241.    Defendant Warnecke under color of law directly participated in or directed St. Louis Police officers, including but not limited to, on information and belief, saying that she had extra officers over the July 4th holiday weekend and "she put them to work," in improperly detaining and arresting homeless and homeless-appearing people in downtown St. Louis, forcing homeless and homeless-appearing people to remove themselves from public parks and other public areas and warning them that certain downtown areas are off-limits to them because of their homeless status, seizing and destroying the personal property of homeless and homeless-appearing people, confining homeless and homeless-appearing people in jail for longer than needed to obtain a

warrant, preventing homeless people with proper licenses and permits from engaging in the authorized activities, and forcing homeless and homeless-appearing people to perform manual labor under threat of confinement and without seeing a judge.

242.    In her actions described above, Defendant Warnecke intentionally disregarded known facts or alternatively was deliberately indifferent to a risk of the constitutional violations of which she knew or should have known, and her culpability caused the deprivation of Plaintiffs' rights under the Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution as described above.

243.    Defendant Warnecke under color of law directly participated in or directed the unlawful, deliberate, malicious, reckless, and wanton conduct of St. Louis Metropolitan Police officers described above.

244.    As a direct and proximate result of the policies, practices, acts, and failures to act of Defendant Warnecke, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden suffered intimidation, humiliation, embarrassment, and emotional distress, and mental anguish.  Plaintiffs Brinkman, Tate, Henley, Jackson, Kitchen, Smith, Hunnicutt, Swift, and Tolliver suffered damages for the loss of their personal property.

245.    The acts and failures to act of Defendant Warnecke were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of the Plaintiffs, thus entitling them to an award of punitive damages against Defendant Warnecke in her individual capacity.

66

246.    If Plaintiffs prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden pray that this Court enter an order on Count II:

a.    Declaring that the above-described policies, practices, customs, and usage violate Plaintiffs' rights under the Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution;

b.    Preliminarily and permanently enjoining Defendant Warnecke, her successors in office, all those under her control or supervision or who are in active concert and participation with her, from carrying out, implementing, maintaining, and enforcing the above-described policies, practices, customs, and usage;

c.    Awarding compensatory damages for each Plaintiff in an amount that is fair, just, and reasonable under the circumstances;

d.    Awarding punitive damages against Defendant Warnecke in her individual capacity;

e.    Awarding Plaintiffs their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

f.    Awarding Plaintiffs the costs of this action and such other relief as the

Court deems fair and appropriate under the circumstances.

## COUNT III

### POLICY AND/OR PRACTICE AND CUSTOM OF REMOVING HOMELESS PEOPLE FROM DOWNTOWN ST. LOUIS DIRECTED AGAINST THE CITY OF ST. LOUIS COGNIZABLE UNDER 42 U.S.C. § 1983

For their causes of action against Defendant City of St. Louis in Count III, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden state:

247.    Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden incorporate by reference each and every allegation and averment in paragraphs 1 through 247 of this First Amended Complaint as though fully set forth herein.

248.    There exist and have existed at all times relevant within the St. Louis Metropolitan Police Department and, on information and belief and with reasonable opportunity for further investigation and discovery, the City of St. Louis official policies or customs, practices and usages so pervasive that they constitute the policy of the City and the Department which have caused and will continue to cause the constitutional deprivations suffered by the Plaintiffs as have been more fully set forth herein.

249.    The policies, customs, practices, and usages that exist and have existed are to remove homeless and other homeless-appearing people from downtown St. Louis and discourage them from remaining there by:

           a.       stopping, detaining, and arresting homeless and homeless-

appearing people in downtown St. Louis without probable cause, reasonable suspicion, or lawful excuse or justification;

b.      forcing homeless and homeless-appearing people to move on from public parks, sidewalks, and other public areas in downtown St. Louis without lawful excuse or justification and warning them that certain areas of downtown St. Louis are off-limits to them because of their homeless status;

c.      seizing and destroying the personal property of homeless and homeless-appearing people without probable cause, reasonable suspicion, or lawful excuse or justification;

d.      arresting and confining homeless and homeless-appearing people for up to and in excess of 20 hours without a warrant and without undertaking to obtain one;

e.      hindering and preventing, without lawful excuse or justification, homeless people with exercising the rights and engaging in the activities authorized by proper licenses and permits from the City of St. Louis;

f.      forcing homeless or homeless-appearing people to perform manual labor picking up trash in downtown St. Louis before they have been found or entered a plea  of guilty;

g.      coercing homeless or homeless-appearing people into performing manual labor picking up trash in downtown St. Louis by the use or threat of physical restraint, confinement, or continued confinement

250.    The policies, practices, customs, and usages of removing homeless and homeless-appearing people and discouraging them from remaining in downtown St. Louis by stopping, detaining, and arresting them, by confining them in jail for longer than needed to obtain a warrant, and by seizing and destroying their personal property, all without probable cause, reasonable suspicion, or lawful excuse or justification, violate Plaintiffs' rights to be free from unlawful seizure of their person and property under the Fourth and Fourteenth Amendments to the United States Constitution.

251.     The policies, practices, customs, and usages of removing homeless and homeless-appearing people and discouraging them from remaining in downtown St. Louis by forcing homeless and homeless-appearing people to remove themselves from public parks and other public areas without lawful excuse or justification and warning them that certain areas of downtown St. Louis are off-limits to them because of their homeless status violate Plaintiffs' rights to be, move, and stay put in public places for lawful purposes under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

252.     The policies, practices, customs, and usages of removing homeless and homeless-appearing people and discouraging them from remaining in downtown St. Louis by forcing and coercing them to perform manual labor under threat of confinement before an adjudication of guilt violate the rights of Plaintiffs Johnson, Finch, Higgins, Jordan, and Wooden to be free from involuntary servitude and punishment without a judicial determination of guilt under the Thirteenth and Fourteenth Amendments to the United States Constitution.

253.     The City of St. Louis has the power and responsibility to prevent the existence of the policies and practices described above and has failed and refused to do so.  The failure of the City of St. Louis to prevent constitutionally violative conduct as described above caused the constitutional deprivations that have been suffered by the Plaintiffs.

254.     The failure of the City of St. Louis to act affirmatively in the face of transgressions about which they knew or should have known establishes the policy of the City of St. Louis to engage in, condone, and otherwise tolerate the constitutionally

violative conduct alleged in this complaint.  Had the City acted affirmatively and properly to prevent the existence of the policies and practices described above, the constitutional deprivations suffered by the Plaintiffs would not have occurred.

255.    The City of St. Louis is on notice, actual or constructive, of the practice of improperly detaining and arresting homeless and homeless-appearing people in downtown St. Louis, forcing homeless and homeless-appearing people to remove themselves from public parks and other public areas and warning them that certain downtown areas are off-limits to them because of their homeless status, seizing and destroying the personal property of homeless and homeless-appearing people, taking homeless and homeless-appearing people out of their location  and abandoning them, confining homeless and homeless-appearing people in jail for longer than needed to obtain a warrant, preventing homeless people with proper licenses and permits from engaging in the authorized activities, and forcing homeless and homeless-appearing people to perform manual labor under threat of confinement and without seeing a judge because Plaintiffs' counsel notified Mayor and Police Commissioner Slay, the City Counselor, and Chief of Police Mokwa of this practice.  Nevertheless, the City of St. Louis did nothing to prevent or stop the practice.

256.    In their failures described above, the City of St. Louis intentionally disregarded known facts or alternatively was deliberately indifferent to a risk of the constitutional violations of which they knew or should have known and their culpability caused the constitutional violations suffered by the Plaintiffs.

257.    As a direct and proximate result of the policies, customs, practices, and usages of the City of St. Louis as described above, Plaintiffs Johnson, Tate, Brinkman,

Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden suffered intimidation, humiliation, embarrassment, and emotional distress, and Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden suffered mental anguish as a result of the conduct that resulted in deprivation of their Constitutional rights.   Plaintiffs Brinkman, Tate, Henley, Jackson, Kitchen, Smith, Hunnicutt, Swift, and Tolliver suffered damages for the loss of their personal property.

258.   If Plaintiffs prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden pray that this Court enter an order on Count III:

a.      Declaring that the above-described policies, practices, customs, and usage violate Plaintiffs' rights under the Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution;

b.      Preliminarily and permanently enjoining the City of St. Louis, its agents, employees,  officials, their successors in office, and all those under their control or supervision or who are in active concert and participation with them from carrying out,

implementing, maintaining, and enforcing the above-described policies, practices, customs, and usage;

c.      Awarding compensatory damages for each Plaintiff in an amount that is fair, just, and reasonable under the circumstances;

d.      Awarding Plaintiffs their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

e.      Awarding Plaintiffs the costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT IV

**CONSPIRACY AND/OR JOINT ACTION TO REMOVE HOMELESS PEOPLE FROM DOWNTOWN ST. LOUIS AMONG ST. LOUIS BOARD OF POLICE COMMISSIONERS, WARNECKE, THE CITY OF ST. LOUIS, DOWNTOWN ST. LOUIS COMMUNITY IMPROVEMENT DISTRICT, INC., AND DOWNTOWN ST. LOUIS PARTNERSHIP, INC. COGNIZABLE UNDER 42 U.S.C. § 1983 AND THE THIRTENTH AMENDMENT**

For their causes of action against Defendants St. Louis Police Board, Warnecke, City of St. Louis, and Downtown CID/Partnership in Count IV, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden state:

259.    Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden incorporate by reference each and every allegation and averment in paragraphs 1 through 258 of this First Amended Complaint as though fully set forth herein.

260.   There exist and have at all times existed joint action and/or an agreement and mutual understanding among Defendants St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership to use the municipal ordinance enforcement process to remove homeless and homeless-appearing people from downtown St. Louis and discourage them from remaining there by:

   a.   stopping, detaining, and arresting homeless and homeless-appearing people in downtown St. Louis without probable cause, reasonable suspicion, or lawful excuse or justification;

   b.   forcing homeless and homeless-appearing people to move on from public parks, sidewalks, and other public areas in downtown St. Louis without lawful excuse or justification and warning them that certain areas of downtown St. Louis are off-limits to them because of their homeless status;

   c.   seizing and destroying the personal property of homeless and homeless-appearing people without probable cause, reasonable suspicion, or lawful excuse or justification;

   d.   arresting and confining homeless and homeless-appearing people for up to and in excess of 20 hours without a warrant and without undertaking to obtain one;

   e.   hindering and preventing, without lawful excuse or justification, homeless people with exercising the rights and engaging in the activities authorized by proper licenses and permits from the City of St. Louis;

   f.   forcing homeless or homeless-appearing people to perform manual labor picking up trash in downtown St. Louis before they have been found or entered a plea  of guilty;

   g.   coercing homeless or homeless-appearing people into performing manual labor picking up trash in downtown St. Louis by the use or threat of physical restraint, confinement, or continued confinement.

261.   Defendants St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis

Partnership acted jointly, in concert and conspiracy, and/or participated willingly in using the municipal ordinance enforcement process to remove homeless and homeless-appearing people from downtown St. Louis and discourage them from remaining there by:

a.    stopping, detaining, and arresting homeless and homeless-appearing people in downtown St. Louis without probable cause, reasonable suspicion, or lawful excuse or justification;

b.    forcing homeless and homeless-appearing people to move on from public parks, sidewalks, and other public areas in downtown St. Louis without lawful excuse or justification and warning them that certain areas of downtown St. Louis are off-limits to them because of their homeless status;

c.    seizing and destroying the personal property of homeless and homeless-appearing people without probable cause, reasonable suspicion, or lawful excuse or justification;

d.    arresting and confining homeless and homeless-appearing people for up to and in excess of 20 hours without a warrant and without undertaking to obtain one;

e.    hindering and preventing, without lawful excuse or justification, homeless people with exercising the rights and engaging in the activities authorized by proper licenses and permits from the City of St. Louis;

f.    forcing homeless or homeless-appearing people to perform manual labor picking up trash in downtown St. Louis before they have been found or entered a plea of guilty;

g.    coercing homeless or homeless-appearing people into performing manual labor picking up trash in downtown St. Louis by the use or threat of physical restraint, confinement, or continued confinement.

262.    The joint action and/or the actions of Defendants St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership in furtherance of their conspiracy to use the municipal ordinance enforcement process to remove homeless and homeless-appearing people from

downtown St. Louis and discourage them from remaining there by stopping, detaining, and arresting them, by confining them in jail for longer than needed to obtain a warrant, and by seizing and destroying their personal property, all without probable cause, reasonable suspicion, or lawful excuse or justification, violate Plaintiffs' rights to be free from unlawful seizure of their person and property under the Fourth and Fourteenth Amendments to the United States Constitution.

263.   The joint action and/or the actions of Defendants St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership in furtherance of their conspiracy to use the municipal ordinance enforcement process to remove homeless and homeless-appearing people from downtown St. Louis and discourage them from remaining there by forcing them to remove themselves from public parks and other public areas without lawful excuse or justification and warning them that certain areas of downtown St. Louis are off-limits to them because of their homeless status violate Plaintiffs' rights to be, move, and stay put in public places for lawful purposes under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

264.   The joint actions and/or the actions of Defendants St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership in furtherance of their conspiracy to use the municipal ordinance enforcement process to remove homeless and homeless-appearing people from downtown St. Louis and discourage them from remaining there by forcing and coercing them to perform manual labor under threat of confinement before an adjudication of guilt violate the rights of Plaintiffs Johnson, Finch, Higgins, Jordan, and Wooden to be free

from involuntary servitude and punishment without a judicial determination of guilt under the Thirteenth and Fourteenth Amendments to the United States Constitution.

265.    In their actions described above, Defendants St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership intentionally disregarded known facts or alternatively were deliberately indifferent to a risk of the constitutional violations of which they knew or should have known and their conduct caused the constitutional violations suffered by the Plaintiffs.

266.    As a direct and proximate result of the joint action and/or the actions of in furtherance of their conspiracy to use the municipal ordinance enforcement process to remove homeless and homeless-appearing people from downtown St. Louis and discourage them from remaining there, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden suffered intimidation, humiliation, embarrassment, and emotional distress, and Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden suffered mental anguish as a result of the conduct that resulted in deprivation of their Constitutional rights.   Plaintiffs Brinkman, Tate, Henley, Jackson, Kitchen, Smith, Hunnicutt, Swift, and Tolliver suffered damages for the loss of their personal property.

267.    The actions and failures to act of St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St.

Louis Partnership were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of the Plaintiffs, thus entitling them to an award of punitive damages against Defendants Warnecke, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership.

268.    If Plaintiffs prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Johnson, Tate, Brinkman, Edwards, Jackson, White, Harris, Trawick, Coleman, Henley, Kitchen, Holbrook, Smith, Artis, Burnett, Dickens, Finch, Higgins, Hunnicutt, Jordan, Loyd, Reynolds, Ross, Swift, Tolliver, and Wooden pray that this Court enter an order on Count IV:

a.    Declaring that the above-described conspiracy and/or joint action among Defendants St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership violate Plaintiffs' rights under the Fourth, Thirteenth, and Fourteenth Amendments to the United States Constitution;

b.    Preliminarily and permanently enjoining the St. Louis Police Board, Warnecke, City of St. Louis, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership, their agents, employees,  officials, their successors in office, and all those under their control or supervision or who are in active concert and participation with them from carrying out, implementing, maintaining, and enforcing the above-described policies, practices, customs, usage, joint action, mutual agreement,

78

and/or conspiracy;

    c.    Awarding compensatory damages for each Plaintiff in an amount that is fair, just, and reasonable under the circumstances;

    d.    Awarding punitive damages against Defendants Warnecke, Downtown St. Louis Community Improvement District, and Downtown St. Louis Partnership;

    e.    Awarding Plaintiffs their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

    f.    Awarding Plaintiffs the costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT V

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANT DRAGO AND JOHN/JANE DOES 1 - 25 COGNIZABLE UNDER 42 U.S.C. § 1983

For their causes of action against Defendants Drago and John/Jane 1 - 25 in Count V, Plaintiffs Johnson, Hunnicutt, and Swift state:

269.    Plaintiffs Johnson, Hunnicutt, and Swift incorporate by reference each and every allegation and averment in paragraphs 1 through 268 of this First Amended Complaint as though fully set forth herein.

270.    Defendants Drago and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiffs Johnson, Hunnicutt, and Swift against their will.

271.    Defendants Drago and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiffs Johnson, Hunnicutt, and Swift from being in public places for lawful purposes.

272.    Defendants Drago and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, seized and destroyed the personal of property of Plaintiff Swift.

273.    The detention, continuing seizure, and arrest of Plaintiffs Johnson, Hunnicutt, and Swift were and are in violation of their right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

274.    Interfering with and preventing Plaintiffs Johnson, Hunnicutt, and Swift from engaging in lawful activities in public places for lawful purposes were and are in violation of the right of Plaintiffs Johnson, Hunnicutt, and Switt to move, stay put, and engage in lawful activities in public places secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

275.    The seizure and destruction of the personal property of Plaintiffs Swift and Hunnicutt were and are in violation of their right to be free from unreasonable seizure of their property secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

276. As a direct and proximate result of their arrest, detention and physical restraint by Defendants Drago and John/Jane Does 1 - 25, said Defendants' interference with their ability to engage in lawful activities in public places, and said Defendants' destruction of Plaintiff Swift's personal property, all as aforedescribed, Plaintiffs Johnson, Hunicutt, and Swift suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

277. As a direct and proximate result of the destruction of Plaintiff Swift's personal property by Defendants Drago and John/Jane Does 1 - 25 as aforedescribed, Plaintiff Swift suffered damages for the loss of his personal property.

278. The acts and failures to act of Defendants Drago and John/Jane Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiffs Johnson, Hunnicutt, and Swift, thus entitling them to an award of punitive damages against said Defendants.

279. If Plaintiffs Johnson, Hunnicutt, and Swift prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Johnson, Hunnicutt, and Swift pray that this Court enter a judgment against Defendants Drago and John/Jane Does 1 - 25, jointly and severally, on Count V for:

a. Compensatory damages for Plaintiffs Johnson, Hunnicutt, and Swift in an amount that is fair, just, and reasonable under the circumstances;

b. Punitive damages;

81

c.      Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.      The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

**COUNT VI**

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANT BONENBERGER AND JOHN/JANE DOES
1 - 25 COGNIZABLE UNDER 42 U.S.C. § 1983**

For his cause of action against Defendants Bonenberger and John/Jane Does 1 - 25 in Count VI, Plaintiff Trawick states:

280.    Plaintiff Trawick incorporates by reference each and every allegation and averment in paragraphs 1 through 279 of this First Amended Complaint as though fully set forth herein.

281.    Defendants Bonenberger and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff Trawick against his will.

282.    Defendants Bonenberger and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Trawick from being in a public place for lawful purposes.

283.    The detention, continuing seizure, and arrest of Plaintiff Trawick were and are in violation of his right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

284.    Interfering with and preventing Plaintiff Trawick from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Trawick to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

285.    As a direct and proximate result of his arrest, detention and physical restraint by Defendants Bonenberger and John/Jane Does 1 - 25 and said Defendants' interference with his ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Trawick suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

286.    The acts and failures to act of Defendants Bonenberger and John Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiffs Trawick, thus entitling him to an award of punitive damages against said Defendants.

287.    If Plaintiff Trawick prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Trawick prays that this Court enter judgment against

Defendants Bonenberger and John/Jane Does 1 - 25, jointly and severally, on Count VI for:

a.      Compensatory damages for Plaintiff Trawick in an amount that is fair, just, and reasonable under the circumstances;

b.       Punitive damages;

c.      Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.      The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

**COUNT VII**

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES
FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND
FOURTEENTH AMENDMENTS BY DEFENDANT BROWN
COGNIZABLE UNDER 42 U.S.C. § 1983**

For his cause of action against Defendant Brown in Count VII, Plaintiff Edwards states:

288.    Plaintiff Edwards incorporates by reference each and every allegation and averment in paragraphs 1 through 287 of this First Amended Complaint as though fully set forth herein.

289.    Defendant Brown without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification interfered with and prevented Plaintiff Edwards from being on the public sidewalk and from selling *What's Up* magazine pursuant to his lawfully issued license or permit.

290.    Interfering with and preventing Plaintiff Edwards from engaging in lawful activities in public places for lawful purposes were and are in violation of the right of Plaintiff Edwards to move, stay put, and engage in lawful activities in public places secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

291.    As a direct and proximate result of the interference with his ability to engage in lawful activities in public places, Plaintiff Edwards suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

292.    The acts of Defendant Brown as aforedescribed were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff Edwards, thus entitling him to an award of punitive damages against said Defendant.

293.    If Plaintiff Edwards prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Edwards prays that this Court enter judgment against Defendant Brown on Count VII for:

a.    Compensatory damages for Plaintiff Edwards in an amount that is fair, just, and reasonable under the circumstances;

b.     Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.      The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

**COUNT VIII**

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANT COATS AND JOHN/JANE DOES ONE
THROUGH TEN COGNIZABLE UNDER 42 U.S.C. § 1983**

For their causes of action against Defendants Coats and John/Jane Does 1 - 25 in Count VIII, Plaintiffs Brinkman, Harris, and Dickens state:

294.    Plaintiffs Brinkman, Harris, and Dickens incorporate by reference each and every allegation and averment in paragraphs 1 through 293 of this First Amended Complaint as though fully set forth herein.

295.    Defendants Coats and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiffs Brinkman, Harris, and Dickens against their will.

296.    Defendants Coats and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiffs Brinkman, Harris, and Dickens from being in public places for lawful purposes.

297.    Defendant Coats and John/Jane Does 1 - 25, acting individually or jointly and in concert, assaulted, battered, beat, and otherwise brutalized Plaintiff Brinkman as aforedescribed and thereby unreasonably seized Plaintiff Brinkman.

298.    Defendants Coats and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, seized and destroyed the personal of property of Plaintiff Brinkman.

299.    The detention, continuing seizure, and arrest of Plaintiffs Brinkman, Harris, and Dickens were and are in violation of their right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

300.    Interfering with and preventing Plaintiffs Brinkman, Harris, and Dickens from engaging in lawful activities in public places for lawful purposes were and are in violation of the right of Plaintiffs Brinkman, Harris, and Dickens to move, stay put, and engage in lawful activities in public places secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

301.    As a direct and proximate result of the aforedescribed unlawful and malicious physical abuse of Plaintiff Brinkman by Defendants Coats and John/Jane Does 1 - 25, Plaintiff Brinkman suffered grievous bodily harm and was deprived of his right to be free from unreasonable seizure of his person and from excessive force secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

302.    The seizure and destruction of the personal property of Plaintiff Brinkman were and are in violation of Plaintiff Brinkman's right to be free from unreasonable

seizure of his property secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

303.    As a direct and proximate result of their arrest, detention and physical restraint by Defendants Coats and John/Jane Does 1 - 25, said Defendants' interference with their ability to engage in lawful activities in public places, and said Defendants' destruction of Plaintiff Brinkman's personal property, all as aforedescribed, Plaintiffs Brinkman, Harris, and Dickens suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

304.    As a direct and proximate result of the malicious, brutal, and outrageous conduct of Defendants Coats and John/Jane Does 1 - 25 as aforedescribed, Plaintiff Brinkman suffered severe and permanent injuries, including bruises on his chest and side, welts and abrasions on his wrists, and Plaintiff Brinkman's body was rendered weak, stiff, sore, and painful.  The brutal assault on Plaintiff Brinkman at the hands of Defendants Coats and John/Jane Does 1 - 25 has caused him to be fearful for his life and the injuries to his body and the great fear for his safety has caused Plaintiff Brinkman pain in the mind as well as of the body and fear, apprehension, depression, and consternation.  Plaintiff Brinkman has a mental health diagnosis of post-traumatic stress disorder, and the assault by Defendants Coats and John/Jane Does 1 - 25 has exacerbated his fear, apprehension, depression, and consternation.  Plaintiff Brinkman also suffered special damages in the form of lost wages.

305.    As a direct and proximate result of the destruction of Plaintiff Brinkman's personal property by Defendants Coats and John/Jane Does 1 - 25 as aforedescribed, Plaintiff Brinkman suffered damages for the loss of his personal property.

306.    The acts and failures to act of Defendants Coats and John/Jane Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiffs Brinkman, Harris, and Dickens, thus entitling them to an award of punitive damages against said Defendants.

307.    If Plaintiffs Brinkman, Harris, and Dickens prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Brinkman, Harris, and Dickens pray that this Court enter judgment against Defendants Coats and John/Jane Does 1 - 25, jointly and severally, on Count VIII for:

a.    Compensatory damages for Plaintiffs Brinkman, Harris, and Dickens in an amount that is fair, just, and reasonable under the circumstances;

b.     Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.    The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT IX

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANT DAVENPORT AND JOHN/JANE DOES 1 - 25
COGNIZABLE UNDER 42 U.S.C. § 1983**

For their causes of action against Defendants Davenport and John/Jane Does 1 - 25 in Count IX, Plaintiffs Jackson and Tolliver state:

308.   Plaintiffs Jackson and Tolliver incorporate by reference each and every allegation and averment in paragraphs 1 through 307 of this First Amended Complaint as though fully set forth herein.

309.   Defendants Davenport and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiffs Jackson and Tolliver against their will.

310.   Defendants Davenport and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiffs Jackson and Tolliver from being in public places for lawful purposes.

311.   Defendants Davenport and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, seized and destroyed the personal of property of Plaintiff Tolliver.

312.   The detention, continuing seizure, and arrest of Plaintiffs Jackson and Tolliver were and are in violation of their right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

313.    Interfering with and preventing Plaintiffs Jackson and Tolliver from engaging in lawful activities in public places for lawful purposes were and are in violation of the right of Plaintiffs Jackson and Tolliver to move, stay put, and engage in lawful activities in public places secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

314.    The seizure and destruction of the personal property of Plaintiff Tolliver were and are in violation of Plaintiff Tolliver's right to be free from unreasonable seizure of his property secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

315.    As a direct and proximate result of their arrest, detention and physical restraint by Defendants Davenport and John/Jane Does 1 - 25, said Defendants' interference with their ability to engage in lawful activities in public places, and said Defendants' destruction of Plaintiff Tolliver's personal property, all as aforedescribed, Plaintiffs Jackson and Tolliver suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

316.    As a direct and proximate result of the destruction of Plaintiff Tolliver's personal property by Defendants Davenport and John/Jane Does 1 - 25 as aforedescribed, Plaintiff Tolliver suffered damages for the loss of his personal property.

317.    The acts and failures to act of Defendants Davenport and John/Jane Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiffs Jackson and Tolliver, thus entitling them to an award of punitive damages against said Defendants.

318.    If Plaintiffs Jackson and Tolliver prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Jackson and Tolliver pray that this Court enter judgment against Defendants Davenport and John/Jane Does 1 - 25, jointly and severally, on Count IX for:

a.    Compensatory damages for Plaintiffs Jackson and Tolliver in an amount that is fair, just, and reasonable under the circumstances;

b.    Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.    The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

**COUNT X**

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANT ERNST
COGNIZABLE UNDER 42 U.S.C. § 1983**

For his cause of action against Defendant Ernst in Count X, Plaintiff Ross states:

319.    Plaintiff Ross incorporates by reference each and every allegation and averment in paragraphs 1 through 318 of this First Amended Complaint as though fully set forth herein.

320.    Defendant Ernst, acting without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff Ross against his will.

321.    Defendant Ernst, acting without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Ross from being in a public place for lawful purposes.

322.    The detention, continuing seizure, and arrest of Plaintiff Ross were and are in violation of his right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

323.    Interfering with and preventing Plaintiff Ross from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Ross to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

324.    As a direct and proximate result of his arrest, detention and physical restraint by Defendant Ernst and said Defendant's interference with his ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Ross suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

325.    The acts and failures to act of Defendant Ernst were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff Ross, thus entitling him to an award of punitive damages against said Defendant.

326.    If Plaintiff Ross prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Ross prays that this Court enter judgment against Defendant Ernst on Count X for:

a.    Compensatory damages for Plaintiff Ross in an amount that is fair, just, and reasonable under the circumstances;

b.     Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.    The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT XI

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANTS FISHER AND JOHN/JANE DOES 1 – 25 COGNIZABLE UNDER 42 U.S.C. § 1983

For her cause of action against Defendants Fisher and John/Jane Does 1 - 25 in Count XI, Plaintiff Finch states:

327.    Plaintiff Finch incorporates by reference each and every allegation and averment in paragraphs 1 through 326 of this First Amended Complaint as though fully set forth herein.

328.    Defendants Fisher and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff Finch against her will.

329.    Defendants Fisher and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Finch from being in a public place for lawful purposes.

330.    The detention, continuing seizure, and arrest of Plaintiff Finch were and are in violation of her right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

331.    Interfering with and preventing Plaintiff Finch from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Finch to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

332.    As a direct and proximate result of her arrest, detention and physical restraint by Defendants Fisher and John/Jane Does 1 - 25 and said Defendants' interference with her ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Finch suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

333.     The acts and failures to act of Defendants Fisher and John/Jane Does 1 -
25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to
the rights of Plaintiff Finch, thus entitling her to an award of punitive damages against
said Defendants.

334.     If Plaintiff Finch prevails, she is entitled to an award of her reasonable
attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the
Washington University School of Law Civil Justice Clinic, and the American Civil
Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Finch prays that this Court enter judgment against
Defendants Fisher and John/Jane Does 1 - 25, jointly and severally, on Count XI for:

a.     Compensatory damages for Plaintiff Finch in an amount that is fair, just,
and reasonable under the circumstances;

b.     Punitive damages;

c.     Reasonable attorneys' fees and costs for the time of the St. Louis
University Legal Clinic, the Washington University School of Law Civil Justice Clinic,
and the American Civil Liberties Union of Eastern Missouri;

d.     The costs of this action and such other relief as the Court deems fair and
appropriate under the circumstances.

## COUNT XII

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANT JOHN DOE 1 COGNIZABLE UNDER 42 U.S.C. § 1983

For his cause of action against Defendant John Doe 1 in Count XII, Plaintiff Tate

states:

335.     Plaintiff Tate incorporates by reference each and every allegation and averment in paragraphs 1 through 334 of this First Amended Complaint as though fully set forth herein.

336.     Defendant John Doe 1, acting without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff Tate against his will.

337.     Defendant John Doe 1, acting without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Tate from being in a public place for lawful purposes.

338.     Defendant John Doe 1, acting without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, seized and destroyed the personal of property of Plaintiff Tate.

339.     The detention, continuing seizure, and arrest of Plaintiff Tate were and are in violation of his right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

340.     Interfering with and preventing Plaintiff Tate from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Tate to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

341.    The seizure and destruction of the personal property of Plaintiff Tate were and are in violation of Plaintiff Tate's right to be free from unreasonable seizure of his property secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

342.    As a direct and proximate result of his arrest, detention and physical restraint by Defendant John Doe 1, said Defendant's interference with his ability to engage in lawful activities in public places, and said Defendant's destruction of Plaintiff Tate's personal property, all as aforedescribed, Plaintiff Tate suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

343.    The acts and failures to act of Defendant John Doe 1 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff Tate, thus entitling him to an award of punitive damages against said Defendant.

344.    If Plaintiff Tate prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Tate prays that this Court enter judgment against Defendant John Doe 1 on Count XII for:

a.    Compensatory damages for Plaintiff Tate in an amount that is fair, just, and reasonable under the circumstances;

b.     Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic,

and the American Civil Liberties Union of Eastern Missouri;

      d.     The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT XIII

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANT NERVIANI AND JOHN/JANE DOES 1 - 25 COGNIZABLE UNDER 42 U.S.C. § 1983

For their causes of action against Defendants Nerviani and John/Jane Does 1 - 25 in Count XIII, Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith state:

345.    Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith incorporate by reference each and every allegation and averment in paragraphs 1 through 344 of this First Amended Complaint as though fully set forth herein.

346.    Defendants Nerviani and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith against their will.

347.    Defendants Nerviani and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith from being in public places for lawful purposes.

348.    Defendants Nerviani and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, seized and destroyed the personal of property of Plaintiffs Henley, Jackson, Kitchen, and Smith.

349.    The detention, continuing seizure, and arrest of Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith were and are in violation of their right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

350.    Interfering with and preventing Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith from engaging in lawful activities in public places for lawful purposes were and are in violation of the right of Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith to move, stay put, and engage in lawful activities in public places secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

351.    The seizure and destruction of the personal property of Plaintiffs Henley, Jackson, Kitchen, and Smith were and are in violation of the right Plaintiffs Henley, Jackson, Kitchen, and Smith to be free from unreasonable seizure of his property secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

352.    As a direct and proximate result of their arrest, detention and physical restraint by Defendants Nerviani and John/Jane Does 1 - 25, said Defendants' interference with their ability to engage in lawful activities in public places, and said Defendants' destruction of the personal property of Plaintiffs Henley, Jackson, Kitchen,

and Smith, all as aforedescribed, Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

353.    As a direct and proximate result of the destruction of the personal property of Plaintiffs Henley, Jackson, Kitchen, and Smith by Defendants Nerviani and John/Jane Does One through Ten as aforedescribed, Plaintiffs Henley, Jackson, Kitchen, and Smith suffered damages for the loss of their personal property.

354.    The acts and failures to act of Defendants Nerviani and John/Jane Does One through Ten were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith, thus entitling them to an award of punitive damages against said Defendants.

355.    If Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith prevail, they are entitled to an award of their reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith pray that this Court enter judgment against Defendants Nerviani and John/Jane Does 1 - 25, jointly and severally, on Count XIII for:

a.      Compensatory damages for Plaintiffs Artis, Coleman, Henley, Jackson, Kitchen, Loyd, and Smith in an amount that is fair, just, and reasonable under the circumstances;

b.       Punitive damages;

c.      Reasonable attorneys' fees and costs for the time of the St. Louis

University Legal Clinic, the Washington University School of Law Civil Justice Clinic,

and the American Civil Liberties Union of Eastern Missouri;

      d.    The costs of this action and such other relief as the Court deems fair and

appropriate under the circumstances.

**COUNT XIV**

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANTS PAYNE AND JOHN/JANE DOES 1 – 25
COGNIZABLE UNDER 42 U.S.C. § 1983**

      For her cause of action against Defendants Payne and John/Jane Does 1 - 25 in

Count XIV, Plaintiff Jordan states:

      356.    Plaintiff Jordan incorporates by reference each and every allegation and

averment in paragraphs 1 through 355 of this First Amended Complaint as though fully

set forth herein.

      357.    Defendants Payne and John/Jane Does 1 - 25, acting individually or jointly

and in concert and without a warrant or lawful authority and without any reasonable

belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff

Jordan against her will.

      358.    Defendants Payne and John/Jane Does 1 - 25, acting individually or jointly

and in concert and without a warrant or lawful authority and without any reasonable

belief, suspicion, probable cause, or lawful excuse or justification, interfered with and

prevented Plaintiff Jordan from being in a public place for lawful purposes.

      359.    The detention, continuing seizure, and arrest of Plaintiff Jordan were and

are in violation of her right to be free from unreasonable seizure of the person secured by

102

the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

360. Interfering with and preventing Plaintiff Jordan from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Jordan to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

361. As a direct and proximate result of her arrest, detention and physical restraint by Defendants Payne and John/Jane Does 1 - 25 and said Defendants' interference with her ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Jordan suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

362. The acts and failures to act of Defendants Payne and John/Jane Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff Jordan, thus entitling her to an award of punitive damages against said Defendants.

363. If Plaintiff Jordan prevails, she is entitled to an award of her reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Jordan prays that this Court enter judgment against Defendants Payne and John/Jane Does 1 - 25, jointly and severally, on Count XIV for:

a. Compensatory damages for Plaintiff Jordan in an amount that is fair, just,

and reasonable under the circumstances;

b.        Punitive damages;

c.        Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.        The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

**COUNT XV**

**UNLAWFUL INTERFERENCE WITH INDIVIDUAL
RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANT RUSSO
COGNIZABLE UNDER 42 U.S.C. § 1983**

For his cause of action against Defendant Russo in Count XV, Plaintiff White states:

364.    Plaintiff White incorporates by reference each and every allegation and averment in paragraphs 1 through 363 of this First Amended Complaint as though fully set forth herein.

365.    Defendant Russo, acting without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff White from being in a public place for lawful purposes.

366.    Interfering with and preventing Plaintiff White from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff White to move, stay put, and engage in lawful activities in a public place secured

by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

367.    As a direct and proximate result of Defendant Russo's interference with the ability of Plaintiff White to engage in lawful activities in a public place, all as aforedescribed, Plaintiff White suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

368.    The acts and failures to act of Defendant Russo were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff White, thus entitling him to an award of punitive damages against said Defendant.

369.    If Plaintiff White prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff White prays that this Court enter judgment against Defendant Russo on Count XV for:

a.    Compensatory damages for Plaintiff White in an amount that is fair, just, and reasonable under the circumstances;

b.     Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.    The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

**COUNT XVI**

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANT STROHMEYER AND JOHN/JANE DOES
1 - 25 COGNIZABLE UNDER 42 U.S.C. § 1983**

For his cause of action against Defendants Strohmeyer and John/Jane Does 1 – 25 in Count XVI, Plaintiff Reynolds states:

370.    Plaintiff Reynolds incorporates by reference each and every allegation and averment in paragraphs 1 through 369 of this First Amended Complaint as though fully set forth herein.

371.    Defendants Strohmeyer and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff Reynolds against his will.

372.    Defendants Strohmeyer and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Reynolds from being in a public place for lawful purposes.

373.    The detention, continuing seizure, and arrest of Plaintiff Trawick were and are in violation of his right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

374.    Interfering with and preventing Plaintiff Reynolds from engaging in lawful activities in a public place for lawful purposes were and are in violation of the

106

right of Plaintiff Reynolds to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

375.    As a direct and proximate result of his arrest, detention and physical restraint by Defendants Strohmeyer and John/Jane Does 1 - 25 and said Defendants' interference with his ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Reynolds suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

376.    The acts and failures to act of Defendants Strohmeyer and John Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiffs Reynolds, thus entitling him to an award of punitive damages against said Defendants.

377.    If Plaintiff Reynolds prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Reynolds prays that this Court enter judgment against Defendants Strohmeyer and John/Jane Does 1 - 25, jointly and severally, on Count XVI for:

a.      Compensatory damages for Plaintiff Reynolds in an amount that is fair, just, and reasonable under the circumstances;

b.       Punitive damages;

c.      Reasonable attorneys' fees and costs for the time of the St. Louis

University Legal Clinic, the Washington University School of Law Civil Justice Clinic,
and the American Civil Liberties Union of Eastern Missouri;

      d.     The costs of this action and such other relief as the Court deems fair and
appropriate under the circumstances.

**COUNT XVII**

**UNLAWFUL SEIZURE AND INTERFERENCE WITH
INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL
PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH
AMENDMENTS BY DEFENDANTS TAYLOR AND JOHN/JANE DOES 1 – 25
COGNIZABLE UNDER 42 U.S.C. § 1983**

      For her cause of action against Defendants Taylor and John/Jane Does 1 - 25 in
Count XVII, Plaintiff Holbrook states:

      378.    Plaintiff Holbrook incorporates by reference each and every allegation and
averment in paragraphs 1 through 377 of this First Amended Complaint as though fully
set forth herein.

      379.    Defendants Taylor and John/Jane Does 1 - 25, acting individually or
jointly and in concert and without a warrant or lawful authority and without any
reasonable belief, suspicion, or probable cause, detained, physically restrained, and
arrested Plaintiff Holbrook against her will.

      380.    Defendants Taylor and John/Jane Does 1 - 25, acting individually or
jointly and in concert and without a warrant or lawful authority and without any
reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered
with and prevented Plaintiff Holbrook from being in a public place for lawful purposes.

      381.    The detention, continuing seizure, and arrest of Plaintiff Holbrook were
and are in violation of her right to be free from unreasonable seizure of the person

108

secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

382.    Interfering with and preventing Plaintiff Holbrook from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Holbrook to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

383.    As a direct and proximate result of her arrest, detention and physical restraint by Defendants Taylor and John/Jane Does 1 - 25 and said Defendants' interference with her ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Holbrook suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.  Plaintiff Holbrook also suffered special damages in the form of lost sales.

384.    The acts and failures to act of Defendants Taylor and John/Jane Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff Holbrook, thus entitling her to an award of punitive damages against said Defendants.

385.    If Plaintiff Holbrook prevails, she is entitled to an award of her reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Holbrook prays that this Court enter judgment against Defendants Taylor and John/Jane Does 1 - 25, jointly and severally, on Count XVII for:

a. Compensatory damages for Plaintiff Holbrook in an amount that is fair, just, and reasonable under the circumstances;

b. Punitive damages;

c. Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d. The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT XVIII

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANT WREN AND JOHN/JANE DOES 1 - 25 COGNIZABLE UNDER 42 U.S.C. § 1983

For his cause of action against Defendants Wren and John/Jane Does 1 - 25 in Count XVIII, Plaintiff Edwards states:

386. Plaintiff Edwards incorporates by reference each and every allegation and averment in paragraphs 1 through 385 of this First Amended Complaint as though fully set forth herein.

387. Defendants Wren and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff Edwards against his will.

388. Defendants Wren and John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable

belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Edwards from being in a public place for lawful purposes.

389.    The detention, continuing seizure, and arrest of Plaintiff Edwards were and are in violation of his right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

390.    Interfering with and preventing Plaintiff Edwards from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Edwards to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

391.    As a direct and proximate result of his arrest, detention and physical restraint by Defendants Wren and John/Jane Does 1 - 25 and said Defendants' interference with his ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Edwards suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

392.    The acts and failures to act of Defendants Wren and John Does 1 – 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiffs Edwards, thus entitling him to an award of punitive damages against said Defendants.

393.    If Plaintiff Edwards prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the

Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Edwards prays that this Court enter judgment against Defendants Wren and John/Jane Does 1 - 25, jointly and severally, on Count XVIII for:

a.      Compensatory damages for Plaintiff Edwards in an amount that is fair, just, and reasonable under the circumstances;

b.       Punitive damages;

c.      Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.      The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT XIX

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANT DUBACH COGNIZABLE UNDER 42 U.S.C. § 1983

For her cause of action against Defendant DuBach in Count XIX, Plaintiff Jordan states:

394.    Plaintiff Jordan incorporates by reference each and every allegation and averment in paragraphs 1 through 393 of this First Amended Complaint as though fully set forth herein.

395.   Defendant DuBach, acting without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, arrested, and charged Plaintiff Jordan.

396.   Defendant DuBach, acting without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Jordan from being in a public place for lawful purposes.

397.   The detention, seizure, and arrest of Plaintiff Jordan were and are in violation of her right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

398.   Interfering with and preventing Plaintiff Jordan from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Jordan to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

399.   As a direct and proximate result of her arrest, detention and physical restraint by Defendant DuBach and said Defendant's interference with her ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Jordan suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

400.    The acts and failures to act of Defendant DuBach were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff Jordan, thus entitling her to an award of punitive damages against said Defendant.

401.    If Plaintiff Jordan prevails, she is entitled to an award of her reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Jordan prays that this Court enter judgment against Defendant DuBach on Count XIX for:

a.    Compensatory damages for Plaintiff Jordan in an amount that is fair, just, and reasonable under the circumstances;

b.     Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.    The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT XX

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANT GRIMES COGNIZABLE UNDER 42 U.S.C. § 1983

For his cause of action against Defendant Grimes in Count XX, Plaintiff White states:

402.    Plaintiff White incorporates by reference each and every allegation and averment in paragraphs 1 through 401 of this First Amended Complaint as though fully set forth herein.

403.    Defendant Grimes, acting without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff White against his will.

404.    Defendant Grimes, acting without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff White from being in a public place for lawful purposes.

405.    The detention, continuing seizure, and arrest of Plaintiff White were and are in violation of his right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

406.    Interfering with and preventing Plaintiff White from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff White to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

407.    As a direct and proximate result of his arrest, detention and physical restraint by Defendant Grimes and said Defendant's interference with the ability of Plaintiff White to engage in lawful activities in a public place, all as aforedescribed,

Plaintiff White suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

408.     The acts and failures to act of Defendant Grimes were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff White, thus entitling him to an award of punitive damages against said Defendant.

409.     If Plaintiff Grimes prevails, he is entitled to an award of his reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff White prays that this Court enter judgment against Defendant Grimes on Count XX for:

a.     Compensatory damages for Plaintiff White in an amount that is fair, just, and reasonable under the circumstances;

b.      Punitive damages;

c.     Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.     The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

## COUNT XXI

### UNLAWFUL SEIZURE AND INTERFERENCE WITH INDIVIDUAL RIGHT TO BE IN PUBLIC PLACES FOR LAWFUL PURPOSES IN VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS BY DEFENDANTS JOHN/JANE DOES 1 – 25 COGNIZABLE UNDER 42 U.S.C. § 1983

For her cause of action against Defendant John/Jane Does 1 - 25 in Count XXI, Plaintiff Wooden states:

410.    Plaintiff Wooden incorporates by reference each and every allegation and averment in paragraphs 1 through 409 of this First Amended Complaint as though fully set forth herein.

411.    Defendants John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, or probable cause, detained, physically restrained, and arrested Plaintiff Wooden against her will.

412.    Defendants John/Jane Does 1 - 25, acting individually or jointly and in concert and without a warrant or lawful authority and without any reasonable belief, suspicion, probable cause, or lawful excuse or justification, interfered with and prevented Plaintiff Wooden from being in a public place for lawful purposes.

413.    The detention, continuing seizure, and arrest of Plaintiff Wooden were and are in violation of her right to be free from unreasonable seizure of the person secured by the Fourth and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

414.    Interfering with and preventing Plaintiff Wooden from engaging in lawful activities in a public place for lawful purposes were and are in violation of the right of Plaintiff Wooden to move, stay put, and engage in lawful activities in a public place secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

415.    As a direct and proximate result of her arrest, detention and physical restraint by Defendants John/Jane Does 1 - 25 and said Defendants' interference with her ability to engage in lawful activities in a public place, all as aforedescribed, Plaintiff Wooden suffered intimidation, humiliation, embarrassment, emotional distress, and mental anguish.

416.    The acts and failures to act of Defendant John/Jane Does 1 - 25 were intentional, wanton, malicious, oppressive, reckless and callously indifferent to the rights of Plaintiff Wooden, thus entitling her to an award of punitive damages against said Defendants.

417.    If Plaintiff Wooden prevails, she is entitled to an award of her reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri.

WHEREFORE, Plaintiff Wooden prays that this Court enter judgment against Defendants John/Jane Does 1 - 25, jointly and severally, on Count XXI for:

a.    Compensatory damages for Plaintiff Wooden in an amount that is fair, just, and reasonable under the circumstances;

b.    Punitive damages;

c.    Reasonable attorneys' fees and costs for the time of the St. Louis University Legal Clinic, the Washington University School of Law Civil Justice Clinic, and the American Civil Liberties Union of Eastern Missouri;

d.    The costs of this action and such other relief as the Court deems fair and appropriate under the circumstances.

Respectfully submitted,


LEGAL SERVICES OF EASTERN MISSOURI, INC.

/s/      Ann B. Lever
Ann B. Lever          ED# 3675
Daniel K. Glazier       ED# 14469
4232 Forest Park Avenue
St. Louis, Missouri 63108
(314) 534-4200  telephone
(314) 534-1028  facsimile
ST. LOUIS UNIVERSITY LEGAL CLINIC


John J. Ammann        ED# 57720
Susan McGraugh
321 N. Spring Avenue
St. Louis, Missouri 63108
(314) 977-2778  telephone
(314) 977-3334  facsimile


WASHINGTON UNIVERSITY SCHOOL OF LAW
CIVIL JUSTICE CLINIC

Jane H. Aiken
Steve J. Gunn
Catherine E. Johnson
One Brookings Drive
Campus Box 1120
St. Louis, Missouri 63130-4899
(314) 935-7238  telephone
(314) 935-5171  facsimile


AMERICAN CIVIL LIBERTIES UNION OF EASTERN
MISSOURI

Stephen M. Ryals  ED# 10602
The Ryals Law Firm
8008 Carondelet, Suite 205
St. Louis, Missouri 63105
(314) 862-6262  telephone
(314) 862-8845  facsimile


Denise D. Lieberman  ED# 47013
American Civil Liberties Union of Eastern Missouri
4557 Laclede Avenue
St. Louis, Missouri 63108
(314) 361-2111  telephone
(314) 361-3135  facsimile